**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Alexander Rafael PEREZ, Hortencia Magaly Pulido, Joaquin Acosta–Lao, aka Paquito, Ramon Gomez, Santiago Preval Planas, aka Pache, Jose Luis Ortiz, aka Louis Abreu, Defendants–Appellants.**

No. 92–2820.

United States Court of Appeals,
Eleventh Circuit.

Sept. 2, 1994.

Michael Allen, Eddins, Allen & Owens, Pensacola, FL, for Alexander Perez.

George Murphy, Valapraiso, FL, for Hortencia Pulido.

M. James Jenkins, Pensacola, FL, for Joaquin Acosta–Lao.

Joseph L. Hammons, Pensacola, FL, for Ramon Gomez.

Spiro T. Kypreos, Pensacola, FL, for Santiago Planas.

Maureen Duignan, Pensacola, FL, for Jose Ortiz.

Randall Hensel, Asst. U.S. Atty., Pensacola, FL, for U.S.

Before COX and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.

PER CURIAM:

The defendants appeal their convictions for conspiracy and possession with intent to distribute crack cocaine. The defendants argue that the district court erred in failing to declare a mistrial after a government witness gave unanticipated and unduly prejudicial testimony regarding an attempt to bribe him not to testify against the defendants. Individual defendants also raise other issues challenging their convictions. We affirm.

## I.  FACTS AND PROCEDURAL HISTORY

On January 29, 1992, the Grand Jury indicted eleven individuals on one count of conspiracy and one count of possession with intent to distribute crack cocaine. The indictees were: Bernardo Iglesias, Jose Alberto Sanchez, Joaquin Acosta–Lao, Alexander Rafael Perez, Santiago Preval Planas, Ramon Gomez, Jose Luis Ortiz, Hortencia Magaly Pulido, Patricia George, Reinaldo Pereira–Poso, and Lazaro Aguilar. Iglesias's indictment was later dismissed on motion of the Government, and George, Sanchez and Pereira–Poso all pled guilty pursuant to plea agreements with the Government. The remaining indictees were tried together. All were convicted on the conspiracy and possession charges except Aguilar, who was found not guilty.

The defendants were involved in the sale and distribution of crack cocaine in and around Ft. Walton Beach, Florida. Most of the sales occurred in Chester Pruitt Park in Ft. Walton Beach. The Government's chief witness, Pedro Goitisolo, was a former member of the conspiracy and testified extensively about its operations.

Goitisolo said that he first became involved when he began driving Aguilar in northwest Florida and south Alabama to make cocaine deliveries. Goitisolo met Acosta–Lao, Perez, and Ortiz with Aguilar at a club in Crestview, Florida when Aguilar needed to purchase some cocaine. Acosta–Lao told Aguilar and Goitisolo to follow him, Perez, and Ortiz to Planas's house in Ft. Walton where he had three ounces of cocaine. When they arrived at Planas's house, they learned that Planas

had just sold the three ounces to another buyer. Acosta–Lao advised Aguilar that he was leaving town for Miami, but that Sanchez would be bringing some cocaine from Miami in the next few days.

Aguilar and Goitisolo went to Chester Pruitt Park later in the week where they met Sanchez. According to Goitisolo, Pereira–Poso would bring the crack cocaine to the park and then Sanchez would oversee its sale and distribution by Gomez and Planas.

Sanchez later recruited Goitisolo as a bodyguard after someone robbed Pulido of twenty-six ounces of Sanchez's crack cocaine. Goitisolo acted as Sanchez's bodyguard for two weeks while Sanchez sold crack cocaine in the Ft. Walton area. At night, Goitisolo accompanied Sanchez to local motel rooms in the area where the gross receipts of the day's sales would be counted by Sanchez and other co-conspirators. During this two-week period, Goitisolo witnessed several sales of crack cocaine by Planas and Gomez.

Other Government witnesses testified to sales of crack in the park by Sanchez, Acosta–Lao, Planas, Pereira–Poso, Gomez, Perez, and Ortiz. Generally, these witnesses testified that Acosta–Lao or Sanchez would oversee the sales and receive the money while Pereira–Poso, Gomez, Ortiz, Perez, and Planas would actually make the sales.

In related testimony, George testified that she and Pereira–Poso accompanied Sanchez to Miami once where he and Pereira–Poso bought two kilograms of powder cocaine and then transformed the powder into crack cocaine at Pulido's house. Pulido then accompanied Sanchez, Pereira–Poso, and George back to the Ft. Walton area. George also confirmed the drug sales by Sanchez, Pereira–Poso, and Planas. Finally, George testified that on one occasion Pereira–Poso had contacted Acosta–Lao for crack cocaine while waiting for Sanchez to return from Miami with more crack cocaine.

Local police became aware of the defendants' activities after Goitisolo became an informant for them. Goitisolo showed the police the motels and vehicles that Sanchez used and informed them of the sales in the park. Shortly thereafter, the police began surveillance on the properties that Goitisolo had identified.

On December 8, 1991, Sanchez and Pereira–Poso were arrested after being stopped in a vehicle Goitisolo had previously identified. Police searched the vehicle and discovered seven "cookies" of crack cocaine. Later that day, Pulido and George were arrested. Pulido and Sanchez had been staying at the Days Inn in Destin, and after the arrests their motel room was searched. Police discovered a Beretta semi-automatic pistol and sandwich bags in their room. Testimony revealed that sandwich bags are used to package crack cocaine. Another semiautomatic pistol was discovered by police following a search of a cottage rented by Pereira–Poso. Vehicles owned by Sanchez and George were also searched; police discovered crack cocaine in a shaving kit in George's vehicle and in the engine compartment of Sanchez's vehicle.

On December 13, 1991, police stopped a vehicle driven by Gomez after it had been observed departing from Planas's house.[1] A drug dog signaled that the vehicle contained drugs, but no drugs were found after a search of the vehicle. Later that day, officers executed a search warrant at Planas's house. While searching the house, Acosta–Lao, Ortiz, and Perez slowly drove by in a Blazer. Officers asked them to stop and the three were questioned. A lady who was inside Planas's house told officers that she was staying with the three at a condo on the beach. Police obtained a search warrant and searched the three's condo after two drug dogs signaled that the room contained drugs. Seven crack cocaine "cookies" were found.

## II. ISSUE ON APPEAL AND CONTENTIONS OF THE PARTIES

The defendants contend that the district court erred in failing to declare a mistrial after Goitisolo testified that someone connected with the defendants offered him $5,000 not to testify against them. The Government maintains that the testimony was a

---

1. Planas's house had been under observation since December 1, 1991.

result of Goitisolo's confusion and the court cured any possible prejudice by explaining to the jury that the testimony was the result of confusion on the part of Goitisolo and by directing them not to consider the testimony.[2]

## III. STANDARD OF REVIEW

■ The decision of whether to grant a mistrial lies within the sound discretion of a trial judge as he or she is in the best position to evaluate the prejudicial effect of improper testimony. *United States v. Holmes,* 767 F.2d 820, 823 (11th Cir.1985) (quoting *United States v. Satterfield,* 743 F.2d 827, 848 (11th Cir.1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985)). We will not reverse a district court's refusal to grant a mistrial unless an abuse of discretion has occurred. *United States v. Christopher,* 923 F.2d 1545, 1554 (11th Cir.1991). When a curative instruction has been given to address some improper and prejudicial evidence, we will reverse only if the evidence "is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Funt,* 896 F.2d 1288, 1295 (11th Cir.1990) (quoting *United States v. Tenorio–Angel,* 756 F.2d 1505, 1512 (11th Cir.1985)).

## IV. DISCUSSION

On cross-examination of Goitisolo, defense counsel questioned him extensively regarding the amount of money the Government was paying him. On re-direct, the Government sought to elicit testimony from Goitisolo that the Government claimed would rehabilitate his credibility. The Government contended that Goitisolo's credibility was damaged by questions on cross-examination that suggested he was testifying for money.

The evidence the Government claimed would cure this damage was Goitisolo's refusal of an offer from two Cuban individuals of $5,000 not to testify at trial.[3] Defense counsel objected to the proposed testimony on numerous grounds including hearsay, Fed. R.Evid. 404(b), irrelevance, Fed.R.Evid. 403, and Fed.R.Evid. 608. The court ultimately concluded that the testimony was admissible.

■ The record is unclear as to why the Government thought this evidence admissible. Except in extremely limited circumstances, which do not apply here, direct examiners cannot bolster the credibility of their own witness by eliciting evidence of specific acts. *See* Stephen A. Saltzburg & Michael M. Martin, 1 *Federal Rules of Evidence* 604–05 (5th Ed.1990); Michael H. Graham,

2. The defendants raise several other issues on appeal. Planas, Acosta–Lao, Gomez, Perez, and Ortiz all challenge sentencing determinations made by the district court. Acosta–Lao and Gomez argue that the court erred in limiting cross-examination of Clifford Bellow, a Government witness. Acosta–Lao, Ortiz, and Perez all argue a variance existed between the single conspiracy charged in the indictment and the evidence at trial. Acosta–Lao, Gomez, and Ortiz contend that cumulative errors by the court deprived them of their right to a fair trial. Acosta–Lao and Ortiz challenge the district court's denial of their motion to suppress evidence seized in the *Terry* stop of Acosta–Lao's Blazer. Pulido contends that the evidence at trial established a fatal variance from the indictment and/or a constructive amendment of the indictment. Pulido also challenges the court's giving of an *Allen* charge to the jury. After reviewing the record, we conclude that these issues are without merit and do not warrant further discussion. *See* 11th Cir. Rule 36–1.

3. Goitisolo's testimony was as follows:
Q. (By Mr. Hensel) Mr. Goitisolo, after a prior court proceeding involving these same defendants did you have occasion to be approached and offered money?
A. (Through the interpreter) Yes.
Q. How much money were you offered?
A. $5,000.
Q. And what were you to do in exchange for the $5,000?
A. Not to come to this, to the trial.

. . . . .

Q. When these people offered you the money did you actually see money?
A. They placed it in front of me, they show it to me.
Q. And you didn't take the money?
A. I was afraid to take it and maybe they were going to take me to someplace and kill me.
Q. I want to go into a new matter. First, none of the defendants here were involved in that, were they, sir, they weren't involved in the offer of money, yes or no? Yes or no?
A. Yes.
Q. None of the defendants here were involved, correct?
A. Yes, one of them was involved.

*Handbook of Federal Evidence* § 608.4, at 453 (2nd ed. 1986); *see also United States v. Scholle*, 553 F.2d 1109, 1122–23 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977) (testimony of DEA agent that Government witness had provided DEA with reliable information elicited to rehabilitate Government witness was a technical violation of Fed.R.Evid. 608(b)).

■ We fail to see how Goitisolo's refusal of the $5,000 bribe could possibly bolster his credibility even had it been admissible evidence. Goitisolo's own testimony indicated that he refused the offer because he feared for his life. Finally, under Fed.R.Evid. 403, the inherently prejudicial nature of this type of evidence far outweighed any possible probative value. Though the Government insisted that Goitisolo would not link the bribe with any of the defendants before the testimony was given, it strains logic to believe that someone *unconnected* with the defendants would be interested in parting with $5,000 to keep Goitisolo from testifying. Clearly the Government should not have elicited this testimony and clearly the court should not have admitted it.

Despite this error, we are unable to say that it should result in the reversal of the defendants' convictions. The reasons for our conclusion are the corrective steps taken by the district court following Goitisolo's improper testimony, the strong support for the defendants' convictions in the record as a whole, and the high standard that applies to review of the denial of a motion for mistrial.

■ Following Goitisolo's improper testimony, the court excused the jury. During the ensuing conference, the Government explained that Goitisolo failed to understand the question posed to him and proposed to cure any prejudice by bringing that fact out before the jury. After the jury was recalled, the Government asked Goitisolo if he was confused by the last question and he responded, "Yes, I was confused." Next, the court instructed the jury as follows:

Ladies and gentlemen, I do want to be certain that you understand the situation here, that the evidence that you have just heard is offered to you to help you under-

stand and evaluate the credibility of this witness. I do want to be sure that you understand my directions to you that it must not be considered by you as any inference of guilt or blame on behalf of these defendants, because I can state quite frankly to you that there is no evidence whatsoever that links these defendants to the events just described and it's my direction to you that in consideration of your verdict, that you must not consider this for any other purpose than to determine the credibility of the witness that has just testified. And it's unfortunate that that confusion came up at that particular moment.

I want to be certain that there is no misunderstanding about that. Are there any of you that feel you cannot accept this instruction given by the court. Can all of you promise that you will do that asked of you on voir dire? All right, notice all of the affirmative head shakes.

When a court gives a direct and explicit curative instruction regarding improper testimony, it supports the court's decision not to grant a mistrial by decreasing the possibility of undue prejudice. *See e.g. United States v. Badia*, 827 F.2d 1458, 1467–68 (11th Cir. 1987), *cert. denied*, 485 U.S. 937, 108 S.Ct. 1115, 99 S.Ct.2d 275 (1988); *United States v. Rouco*, 765 F.2d 983, 992 (11th Cir.1985), *cert. denied*, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); *United States v. Morris*, 827 F.2d 1348, 1351 (9th Cir.1987), *cert. denied*, 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988). We conclude that the court's instructions substantially assuaged any undue prejudice that may have resulted from Goitisolo's improper testimony.

Our decision not to reverse is further bolstered by the strength of the Government's case. Improper and prejudicial testimony "is less likely to mandate a mistrial 'when there is other significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact upon the verdict of the jury.'" *Badia*, 827 F.2d at 1467 (quoting *Rouco*, 765 F.2d at 992).

Several witnesses testified for the Government. Patricia George, one of the defendants' co-indictees, testified about the defen-

dants' drug related activities and specifically implicated Pulido, Acosta–Lao, and Planas. Juanita Lee and Michael Hubbard also testified for the Government. Both Lee and Hubbard were former customers of members of the conspiracy. Each testified to purchasing crack from Planas and each testified to observing the rest of the defendants (except Aguilar and Pulido) in Chester Pruitt Park.[4]

Clifford Bellow also testified for the Government. Bellow became a police informant after observing extensive drug sales in Chester Pruitt Park. Bellow identified all the defendants except Pulido and Aguilar and testified that he observed them in the park participating in drug sales.

Finally, there was extensive testimony from law enforcement officials involved in the arrests and subsequent searches of the defendants' vehicles and dwellings. Their testimony further supported these convictions.

## V. CONCLUSION

Though the court erred in allowing Goitisolo to testify regarding the bribe, we conclude that the court did not err in failing to declare a mistrial. Given the corrective measures taken by the court following the testimony and the strength of the Government's case, we are unable to say that his testimony was "so highly prejudicial as to be incurable by the trial court's admonition." *Funt*, 896 F.2d at 1295.

AFFIRMED.

**4.** Hubbard testified that he saw Gomez in the park but never saw him sell drugs. However, Lee testified that she had previously purchased drugs from Gomez.