United States Court of Appeals,

Eleventh Circuit.

No. 94-4962.

UNITED STATES of America, Plaintiff-Appellee,

v.

Melva LOZANO-HERNANDEZ, Armando Vililla, Huberto Torres-Tamayo, Defendants-Appellants.

July 31, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-148-CR-CCA), C. Clyde Atkins, Judge.

Before COX and BARKETT, Circuit Judges, and BRIGHT[*], Senior Circuit Judge.

BARKETT, Circuit Judge:

Melva Lozano-Hernandez ("Lozano-Hernandez"), Armando Vililla ("Vililla"), and Huberto Torres-Tamayo ("Torres-Tamayo") appeal their convictions for various drug violations after a jury trial.[1] All three appellants were convicted of attempted possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841. Additionally, Lozano-Hernandez was convicted of conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846, conspiracy to possess with the intent to distribute heroin also in violation of 21 U.S.C. § 846, and possession with the intent to distribute heroin in violation of 21 U.S.C. § 841. Vililla and Torres-Tamayo also assert that their sentences were

[*]Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]Co-defendant Eliesar Leal, who is not involved in this appeal, pled guilty to conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846, and attempted possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841.

incorrectly calculated under the sentencing guidelines.

On December 5, 1992, a confidential informant, Antonio Olivera ("Olivera"), introduced an undercover agent, Metro-Dade Detective Jerry Rodriguez ("Rodriguez"), to appellant Melva Lozano-Hernandez. The meeting was held at Olivera's home in Miami. Lozano-Hernandez was seeking a way to ship cocaine into Miami from Colombia. Rodriguez claimed that he was an airline employee, who could use his connections at Miami International Airport to provide protection for drugs smuggled to Miami from Colombia. Rodriguez offered to help Lozano-Hernandez smuggle cocaine in suitcases on either American or Avianca Airlines at a cost of $3,000 per kilogram. Lozano-Hernandez replied that she would discuss these plans with her people in Colombia and get back with Rodriguez and Olivera.

On January 30, 1993, Lozano-Hernandez called Olivera from Colombia to confirm the negotiated smuggling venture. Olivera returned her call and tape recorded the conversation, in which Lozano-Hernandez informed him that her Colombian associates were ready to begin the venture and confirmed the method and fee for the transportation. She indicated that she would be returning to the United States within the week to represent the Colombian organization in both the importation and subsequent distribution of the drugs.

Lozano-Hernandez returned to Miami from Colombia the following week and met with Olivera and Detective Rodriguez, informing them that up to 50 kilograms of were cocaine ready for immediate shipment from Colombia and that the means of transportation and

price were acceptable to the organization. Lozano-Hernandez established communication by facsimile machine (fax) with her Colombian connection, Alejandro de la Verde ("de la Verde"), who would provide detailed descriptions of the suitcases that he arranged to be placed on the flights out of Colombia.

A week later de la Verde faxed a message to Lozano-Hernandez confirming that the shipment was ready and that he would further fax a description of the suitcase after it had been packed for delivery to the airplane. He apprised Lozano-Hernandez that the quality of the cocaine was "super good" and that the shipments would be continuous. On February 19th de la Verde sent a detailed fax description of the suitcase containing the cocaine and asked Lozano-Hernandez to provide him with the details of the manner of delivery and payment. Lozano-Hernandez faxed Verde details of their plans to distribute the drugs in the first suitcase. That same day de la Verde faxed Lozano-Hernandez confirmation of the flight and baggage claim ticket number for the first suitcase of cocaine.

On February 24th, after the Colombian National Police seized the suitcase containing 35 kilograms of cocaine, Lozano-Hernandez met with Detective Rodriguez to discuss the loss of the cocaine. She assured him during that tape-recorded meeting that her organization was so powerful that the loss of one suitcase meant nothing to them and that a second suitcase would be ready to ship either the next Sunday or Wednesday. She promised to obtain the Colombian news articles confirming the seizure, which arrived the next day by fax.

Three days later de la Verde faxed a detailed description of the second suitcase packed for delivery to Avianca Airlines in Colombia. A week later Lozano-Hernandez gave Olivera, the confidential informant, a sample of heroin and asked him to help her distribute a package of heroin she planned to have de la Verde ship with the second suitcase of cocaine. She did not want anyone else but Olivera to know about the heroin, because she did not want to pay a higher transportation fee.

On March 6th, the second suitcase described by de la Verde arrived at Miami International Airport aboard Avianca Airlines. The U.S. Customs Service seized the suitcase, and turned it over to the Drug Enforcement Administration for a planned delivery to Lozano-Hernandez, so that enforcement agencies could identify the persons to whom Lozano-Hernandez and de la Verde intended to sell the drugs in the United States. The suitcase contained 21 separate packages, including 20 kilograms of 96 percent pure cocaine and one half kilogram of 94 percent pure heroin. The United States wholesale price of the cocaine at that time was $18,000 per kilogram. The wholesale price of the heroin was $100,000. Lozano-Hernandez had asked Olivera to sell the one pound of heroin for $115,000 to his clients.

Detective Rodriguez called Lozano-Hernandez to arrange to meet the next day to discuss delivery. Lozano-Hernandez met with Detective Rodriguez, who recorded her agreement to give him $63,000 cash in advance before the cocaine was delivered. She also indicated that her Colombian organization was ready to ship an additional 50 kilograms and agreed to a reduced transportation fee

of $2,500 per kilogram of cocaine for this next load.  On March 8th, Lozano-Hernandez notified Rodriguez that she did not yet have the $63,000.  She said that she had a second separate buyer for the cocaine (the "Fort Lauderdale organization") and that she was waiting to obtain that buyer's phone numbers.  Meanwhile, she asked Detective Rodriguez to release eight of the 21 kilograms so she could sell part of the cocaine in order to obtain the $63,000.  Detective Rodriguez refused and maintained he would not release the suitcase without the fee paid up front.

On March 9th, Lozano-Hernandez made numerous calls on her cellular phone, reporting to Olivera throughout the day that she had not been able to collect the $63,000.  Late that evening she called Olivera to inform him that she finally had all of the money.  Her cellular phone records reveal that the call she made at 8:06 p.m., just prior to informing Olivera that she had the money, was to appellant Huberto Torres-Tamayo's home.

Lozano-Hernandez was tape-recorded in meeting with Detective Rodriguez at Olivera's home the next day.  She brought with her $63,000 in large bills to pay the transportation fee.  After Detective Rodriguez told her that he could not deliver the suitcase until the next day, they discussed her returning the $63,000 to her buyer pending delivery of the cocaine the next day.  She told Detective Rodriguez that she was going to discuss this with her buyer and made two calls from her cellular phone during the meeting.  The tape recording of her side of the telephone conversations, in conjunction with her cellular phone records, reveal that she reported the status of the delayed delivery of the

cocaine during calls made to Torres-Tamayo's home and to his cellular phone.

Early the next morning, Lozano-Hernandez again delivered $63,000, but in smaller bills, to Detective Rodriguez at Olivera's house. Olivera was told that this money came from Lozano-Hernandez's second buyer, the Fort Lauderdale organization. Detective Rodriguez took the money and a white Suburban truck provided by Lozano-Hernandez to DEA headquarters, where the money was seized, and the white truck was outfitted with surveillance electronics and packed with the suitcase containing the drugs for the "controlled" delivery.

At 9:02 a.m. the same day, Lozano-Hernandez left Olivera's house and met with her ex-husband, Armando Vililla, at a shopping center near his apartment. At approximately 11:30 a.m., Rodriguez drove the truck back to meet Lozano-Hernandez at Olivera's house. The suitcase was placed in the garage, where Lozano-Hernandez separated the package of heroin and gave it to Olivera. Lozano-Hernandez and Vililla then tested the remaining 20 kilogram packages of cocaine for quality and repacked them in a cardboard box. According to Olivera, Lozano-Hernandez had hired Vililla to deliver the cocaine to her clients and had agreed to pay him $2,000. At approximately 1:30 p.m., just as Vililla was leaving the house to deliver the box of cocaine, Lozano-Hernandez used her cellular phone to call the home phone number for Torres-Tamayo. At that moment, Detective Rodriguez overheard Lozano-Hernandez saying: "Huberto. Everything's OK, He's on his way. I'll meet you half way."

Surveillance agents followed Vililla to a Texaco Gas station. They observed Vililla park the truck containing the cocaine nearby, and then use the pay phone at the station. They also observed Torres-Tamayo and Eliesar Leal arrive in Torres-Tamayo's car. After talking to Vililla, Torres-Tamayo drove his car next to the truck containing the cocaine, where Leal got out and drove off in the truck containing the cocaine. Leal was later arrested.

Torres-Tamayo, Lozano-Hernandez, and Vililla were arrested together at the Texaco Station. The detective who arrested Torres-Tamayo noted that he acted as if the detective did not exist and attempted to leave the scene by walking away, even after the officers shouted that he was under arrest. The cellular phone that Torres-Tamayo used to communicate with Lozano-Hernandez was seized from his person upon arrest. Torres-Tamayo consented to a search of his home. The agents seized $210,600 cash in large bills located in cardboard boxes in a locked closet in Torres-Tamayo's bedroom. The court admitted $207,600 of this cash as evidence at trial.

## Lozano-Hernandez

Lozano-Hernandez raises one issue on appeal. She contends that the district court abused its discretion in refusing to grant her motions for mistrial based on government witnesses' improper innuendo at trial that she had threatened the confidential informant and was otherwise dangerous, thereby incurably prejudicing the jury against her defense of entrapment. She claims that she is, therefore, entitled to a new trial.

This court reviews the district court's refusal to grant a

mistrial for an abuse of discretion. *United States v. Perez,* 30 F.3d 1407, 1410 (11th Cir.1994). When a curative instruction is given, this court reverses only if the evidence "is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Funt,* 896 F.2d 1288, 1295 (11th Cir.1990) (*quoting United States v. Tenorio-Angel,* 756 F.2d 1505, 1512 (11th Cir.1985)). Upon carefully reviewing this record, we cannot say that under the totality of the circumstances presented in this case, including the overwhelming evidence of guilt presented against Lozano-Hernandez, the district court abused its discretion in denying the motion for mistrial. Accordingly, Lozano-Hernandez' convictions and sentencing are affirmed.

## Vililla

Vililla contends on appeal that because the jury acquitted him of conspiracy to possess with intent to distribute cocaine, the evidence was insufficient to support his conviction for the substantive count of attempted possession with intent to distribute cocaine. Regarding his sentence, Vililla argues that the sentencing court improperly denied his request for a downward adjustment for acceptance of responsibility, and erroneously determined that Vililla was not a minor or minimal participant in the offense. We find no merit to Vililla's arguments.

In general, a review of the evidence is limited to a determination of whether a reasonable juror could find guilt beyond a reasonable doubt. *United States v. Funt,* 896 F.2d 1288, 1291-92 (11th Cir.1990). All evidence must be viewed in the light most favorable to the government, with all reasonable inferences drawn

in favor of supporting the verdict.  *Id.*  Under the facts of this case, the jury could have convicted Vililla of attempted possession, and consistently acquitted him of conspiracy to possess with intent to distribute cocaine.  The attempt count was based on the events of March 11, 1993, and was not coterminous with the charged conspiracy, which spanned several months and involved cocaine transactions prior to Vililla's involvement in the scheme.  Different elements comprise the two offenses, and, in any event, inconsistent jury verdicts are not necessarily a cause for reversal of a conviction, *United States v. Powell,* 469 U.S. 57, 65-67, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) (acquittal may reflect exercise of lenity).  Accordingly, we find that sufficient evidence supported the jury's conviction of Vililla for attempted possession with intent to distribute cocaine.

We likewise affirm Vililla's sentence.  A sentencing court's factual findings for purposes of applying the Federal Sentencing Guidelines are reviewed for clear error.  *United States v. Erves,* 880 F.2d 376, 381 (11th Cir.1989);  *United States v. Hansley,* 54 F.3d 709 (11th Cir.1995);  *United States v. Marin,* 916 F.2d 1536, 1538 (11th Cir.1990).  In light of Vililla's actions in this case, we cannot say that the district court committed clear error in concluding that Vililla's role in the offense surpassed that of a minor or minimal participant, and that he was not entitled to a downward adjustment for acceptance of responsibility.

### Torres-Tamayo

Torres-Tamayo makes several arguments regarding his conviction.  Like Vililla, Torres-Tamayo contends that the evidence

was insufficient to support his conviction. He also argues that the district court abused its discretion in admitting evidence of currency seized at his residence following his arrest, because the government failed to establish at trial a connection between the money and the offense charged. Finally, he claims that the court abused its discretion in refusing to give his "theory of defense" instruction, which he asserts was properly based upon the evidence adduced at trial. Regarding his sentence, Torres-Tamayo contends that the court erred by improperly attributing too great a quantity of drugs to him in calculating his base offense level, and by enhancing his sentence based upon an erroneous determination that he had played a leadership role in the offense.

Torres-Tamayo was convicted under the theory that he aided and abetted the offense. The standard test for determining whether one aided and abetted a criminal offense is whether (1) a substantive offense was committed, (2) an act by the defendant contributed to and furthered the offense, and (3) the defendant intended to aid its commission. *United States v. Jones,* 913 F.2d 1552, 1558 (11th Cir.1990); *United States v. Pareja,* 876 F.2d 1567, 1568 (11th Cir.1989). Although much of the evidence against Torres-Tamayo is circumstantial, when viewed in the light most favorable to the government, we find that the record sufficiently supports the jury's verdict, and that the verdict is a reasonable construction of the evidence. We also find that the trial court did not abuse its discretion in admitting currency seized at Torres-Tamayo's residence following his arrest, or in refusing to give his "theory of defense" instruction.

Regarding Torres-Tamayo's sentence, the district court did not commit clear error in attributing to Torres-Tamayo responsibility for 20 kilograms of cocaine to determine his base offense level. Among other things, the evidence at trial reflected that Torres-Tamayo had at one point provided the full transportation fee of $63,000 to Lozano-Hernandez for all twenty kilograms of cocaine. However, we do find clear error in the district court's decision to enhance Torres-Tamayo's sentence on the basis that he had played a leadership role in the offense.

Section 3B1.1(c) provides for a two-level enhancement when "the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)...." U.S.S.G. § 3B1.1(c) (Nov. 1993). The evidence regarding Torres-Tamayo's role in the narcotics organization was limited to a period of three days. There was absolutely no evidence that he supervised or controlled anyone, or that he exercised management responsibility over the property, assets, or activities of the criminal organization. At best, the evidence shows that he was a buyer of 10 kilograms and intended to sell the other 10 kilograms of cocaine. The district court, based on the evidence presented at trial, clearly erred in concluding that Torres-Tamayo was anything more than a mere buyer of the cocaine. Accordingly, Torres-Tamayo's sentence must be vacated.

Based upon the foregoing, we affirm the convictions and sentences of both Lozano-Hernandez and Vililla. We also affirm Torres-Tamayo's conviction for attempted possession with the intent to distribute cocaine, but vacate as clear error the enhancement of

his sentence under § 3B1.1(c), and remand to the district court for resentencing.

AFFIRMED in part;  VACATED in part;  and REMANDED.

COX, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's opinion with the exception of its holding that the district court erred in enhancing Torres-Tomayo's sentence based on his role in the offense.  The district court enhanced Torres-Tomayo's sentence two levels because it concluded that Torres-Tomayo was "an organizer, leader, manager, or supervisor."  U.S.S.G. § 3B1.1(c) (Nov. 1993).  Vacating the sentence, the court concludes that "[t]here was absolutely no evidence that he supervised or controlled anyone, or that he exercised management responsibility over the property, assets, or activities of the criminal organization."  I disagree.  The record supports the sentence enhancement.

We review the district court's findings with respect to a defendant's role in the offense for clear error, *United States v. Young,* 39 F.3d 1561, 1568 (11th Cir.1994), and the government need prove the defendant's role only by a preponderance of the evidence. *United States v. Yates,* 990 F.2d 1179, 1182 (11th Cir.1993). Adherence to the proper standard of review and burden of proof requires us to affirm Torres-Tomayo's sentence.  The evidence reveals that Torres-Tomayo was to purchase one-half of the shipment of cocaine, (R. 21 at 25-32), was the financier of the transportation fee that had to be paid to obtain delivery of the cocaine (*id.*), and supplied the driver of the truck used to take delivery of the drugs, (R. 17 at 188-90).  The district court did

not clearly err in concluding from this evidence that Torres-Tomayo was more than a "mere buyer," as the court describes him on this appeal. This evidence supports a finding that Torres-Tomayo was involved in "the recruitment of accomplices, claimed right to a larger share of the fruits of the crime," U.S.S.G. § 3B1.1, comment. (n. 4), and "exercised management responsibility over the property, assets, or activities of a criminal organization," U.S.S.G. § 3B1.1, comment. (n. 2).