**[PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

_____

## No. 96-5336
_____

D.C. Docket No. 95-428-CR-UNGARO-BENAGES

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAUL TRUJILLO,
FRANCISCO NELSON FUENTES,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(July 14, 1998)**

Before HATCHETT, Chief Judge, and RONEY and LAY[*], Senior Circuit Judges.

HATCHETT, Chief Judge:

_____

[*] Honorable Donald P. Lay, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

In this cocaine trafficking case, appellants Raul Trujillo and Nelson Fuentes challenge the district court's handling of voir dire, various evidentiary rulings, jury instructions and a modified Allen charge at trial. Fuentes also challenges the district court's imposing a two-level enhancement at sentencing for possession of a firearm. We affirm.

## I. BACKGROUND

In 1994, co-defendant Luis Ruiz approached fellow employee Carlos Chirino (Carlos), seeking his help in an illegal drug transaction. Carlos, aware that his brother Jose Chirino (Jose) worked as a government informant, told Ruiz that his brother was a boat captain and could assist him. In January 1995, Carlos introduced Ruiz and Jose. Approximately one month later, Ruiz introduced Carlos and Jose to co-defendant Narcisco Rodriguez. Jose informed Special Agent Nestor Duarte of the Federal Bureau of Investigation (FBI) of this meeting, and they decided that Jose would pose as a captain of a boat with access to a crew who would act as transporters of cocaine.

In subsequent meetings, which included appellant Raul Trujillo, Rodriguez, and co-defendants Juan Castellanos and Rafael Herryman-Perez, Jose learned that the defendants had arranged for a cocaine delivery to take place near the Turks and Caicos Islands. The defendants instructed Jose to pick up the cocaine, bring it to Miami and deliver it to them. On May 16, 1995, Jose met with and recorded the co-defendants, and then met with Agent Duarte. Jose gave Agent Duarte a paper bag containing $10,000 that Jose said was from Trujillo. Jose, the FBI and the Coast Guard traveled to the Turks and

Caicos Islands, and eventually recovered 31 of the 32 air-dropped bales of cocaine on May 23, 1995. The 31 bales contained 773 kilograms of cocaine. On May 25, the agents shipped the cocaine to Miami, and on May 30, Jose met with Rodriguez, Ruiz, Trujillo and Herryman-Perez to discuss the missing bale of cocaine and the price of the cocaine. On June 2, Jose again met with Rodriguez, Ruiz, Trujillo and Herryman-Perez. Jose taped both meetings, which revealed Trujillo and others discussing the division of the cocaine. Jose agreed to deliver portions of the 773 kilograms of cocaine on June 3. Before this meeting, Castellanos gave appellant Francisco Nelson Fuentes the key to a van that Jose had provided.

On June 3, 1995, the FBI and Drug Enforcement Agency (DEA) placed 300 kilograms of cocaine in two coolers and placed them in the rear of a van. They sprayed the cocaine with Clue Spray.[1] Jose, wearing white pants and a green shirt, drove the van to a supermarket parking lot. The parties had agreed that the person picking up the van would also be dressed in white pants and a green shirt. Fuentes arrived, wearing white pants and a green shirt, and drove the van to a warehouse. The law enforcement agents waited outside of the warehouse for approximately 3½ hours, watching the only exit. The agents then requested that the occupants of the warehouse exit, and Fuentes and co-defendant Juan Lasarte exited the building. Soon after being taken into custody, the law

---

[1] Clue Spray is a material that cannot be seen with the naked eye, but adheres to objects that it comes into contact with and becomes visible through the use of ultraviolet light.

enforcement officials took each of them into a dark area and exposed them to ultraviolet light. Their hands and clothing reacted from exposure to the Clue Spray.

Upon entering the warehouse, the agents found 75 of the 300 kilograms of cocaine. Lasarte and Fuentes had transferred the cocaine to three boxes with 25 kilograms per box. Additional searches of the warehouse revealed: (1) a hidden door to a marijuana-growing lab; (2) the missing 225 kilograms of cocaine under a work bench; and (3) in a room adjacent to the discovery of the boxes of cocaine, a leather pouch that contained a loaded pistol and a concealed weapon permit belonging to Fuentes.[2] Law enforcement agents thereafter arrested Trujillo.

On June 14, 1995, a grand jury in the Southern District of Florida indicted Trujillo, Fuentes and five co-defendants for conspiracy to import cocaine into the United States, in violation of 21 U.S.C. §§ 952(a) and 963; conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Rodriguez and Castellanos entered into plea agreements. Herryman-Perez remained a fugitive. Trujillo, Fuentes, Ruiz and Lasarte went to trial.

The jury acquitted Lasarte on all counts, was unable to reach a verdict on Ruiz, and convicted Trujillo of all three counts. The court sentenced Trujillo to 235 months of imprisonment on each count to run concurrently, 5 years of supervised release and a $150

---

[2] Fuentes testified at trial that he had no knowledge that cocaine was in the van when he picked it up at the supermarket.

special assessment. The jury acquitted Fuentes of Counts I and II, and convicted him of Count III. Fuentes's presentence investigation report (PSI) set his base offense level at 38. Prior to the sentencing hearing, the government filed a written objection to the PSI, urging the district court to impose a two-level upward adjustment, pursuant to U.S.S.G. § 2D1.1(b)(1) (1997), because Fuentes had possessed a firearm during the commission of the drug trafficking crime. At the sentencing hearing, the district court imposed the two-level adjustment, raising Fuentes's total offense level to 40. This two-level adjustment made Fuentes ineligible to qualify for the Safety Valve Provision under section 5C1.2 or the downward departure in section 2D1.1. The district court sentenced Fuentes to 292 months of imprisonment, 5 years of supervised release and a $50 special assessment.

## II. CONTENTIONS

Trujillo and Fuentes contend that the district court abused its discretion in refusing to dismiss the panel of prospective jurors during voir dire after a prospective juror made comments concerning their custodial status. They additionally contend that the district court abused its discretion in failing to grant their motion for mistrial after the government's rebuttal closing argument, erred in issuing its jury instruction for conspiracy and erred in issuing a modified Allen charge.

Trujillo contends that the district court abused its discretion in admitting evidence. He also contends that the government presented insufficient evidence to sustain his convictions and that the district court abused its discretion in denying his motions for mistrial. Fuentes contends that the district court abused its discretion in admitting the

5

testimony of Agent Shamas and erred in enhancing his sentence pursuant to Sentencing Guidelines section 2D1.1(b)(1).

### III.  DISCUSSION

### A.  Voir Dire

At voir dire, prospective juror Heron (juror number 54), a Metro-Dade Corrections Officer, commented that,

> from time to time we have to house federal prisoners and it places someone like myself in a very inviduous position.  I don't think that that would affect my impartiality in any way, but I just wanted to point this out to the Court . . . . from time to time . . . I have to enter cells where defendants are housed, inmates are housed, and I am not sure who is housed where I enter, and I don't know if any of these defendants have ever been housed in the county system.  Two faces do look slightly familiar to me.

Trujillo and Fuentes objected, contending that these comments showed "actual bias" and suggested that Heron believed that they were in custody.  They claimed that these comments tainted the entire panel although Heron did not serve as a member of the jury panel, and they argue that the district court erred in not granting a mistrial.  We review the district court's determination whether to strike an entire jury panel for manifest abuse of discretion.  See United States v. Simmons, 961 F.2d 183, 184 (11th Cir. 1992) (citing United States v. Muller, 698 F.2d 442, 444 (11th Cir. 1983)), cert. denied, 507 U.S. 989 (1993).  The party challenging the refusal to strike a panel "must demonstrate that the juror in question exhibited actual bias:  That is, either an express admission of bias, or proof of specific facts showing such a close connection to the circumstances of the case

6

that bias must be presumed." United States v. Khoury, 901 F.2d 948, 955 (11th Cir. 1990) (internal quotations and citations omitted).

After Heron made these comments, Trujillo's and Fuentes's lawyers asked the court to excuse Heron for cause. The court then questioned Heron, and allowed the lawyers to question Heron. This questioning did not reveal any bias on Heron's part; in fact, Heron repeatedly stated that he could conduct himself in an impartial manner.[3] The district court refused to strike Heron, but he was not selected for the jury panel. Based on this questioning, along with the separate questioning of other prospective jurors, the district court refused to strike the entire panel or grant a mistrial. Additionally, the district court issued the following curative instruction:

> There was a comment made during jury selection by one of the potential jurors who was involved in his – his work was in corrections, that he might have seen one of the defendants. There is absolutely no basis for thinking that these defendants have been in custody, are in custody or anything like that. So, please put anything like that out of your mind.

We hold that the district court did not abuse its discretion in failing to strike the entire jury panel or grant a mistrial. Trujillo and Fuentes have failed to demonstrate that the voir dire proceedings did not comply with the essential demands of fairness. See United States v. Schlei, 122 F.3d 944, 994 (11th Cir. 1997), cert. denied, 118 S. Ct. 1523 (1998). They additionally failed to show any type of bias on behalf of Heron or the jury.

---

[3] Heron stated that he had "no problem" believing that the defendants were not incarcerated, "no problem" having seen Trujillo's lawyer in the Metro Justice Building and that he believed some inmates that are incarcerated are innocent.

7

See Khoury, 901 F.2d at 955.  The district court questioned Heron outside of the presence of the jury, allowed Trujillo's lawyer to question Heron, allowed Trujillo's and Fuentes's lawyers to question other members of the jury and issued a curative instruction.  We find that this voir dire examination detected no juror bias as a result of Heron's comments. Once the jurors took their oath, and "absent evidence to the contrary, we must presume that they were fair and impartial, as indeed they were sworn to be."  Khoury, 901 F.2d at 955.

**B.  Evidentiary Rulings**

Trujillo next contends that the district court erred in admitting certain evidence, specifically:  (1) a note (Government's Exhibit 63) that Metro Dade Detectives Romero and Hopkins removed from Trujillo's mouth and gave to DEA Agent Thomas Velez; (2) Rodriguez's testimony that Trujillo and Herryman-Perez had been incarcerated together in Cuba and had previously engaged in the drug trade; and (3) Rodriguez's testimony that Fuentes admitted in a post-arrest statement that he knew that 300 kilograms of cocaine were in the van.  We review the district court's admission of evidence for abuse of discretion.  See United States v. Mendez, 117 F.3d 480, 484 (11th Cir. 1997).[4]

Trujillo argues that the district court abused its discretion in admitting the note because the government had failed to authenticate the document pursuant to Federal Rule

---

[4] Trujillo additionally contends that the district court abused its discretion in admitting various types of evidence over their hearsay objections.  We find that the district court did not abuse its discretion.  See  Mendez, 117 F.3d at 484.

of Evidence 901. At trial, Special Agent Velez testified that he along with Detectives Romero and Hopkins "booked" Trujillo – that is, secured Trujillo's property, read him his <u>Miranda</u> rights and asked him other booking and administrative questions. Trujillo then asked to use the restroom. While in the restroom, Velez heard Romero yell that Trujillo was eating something, and Velez rushed into the bathroom. He observed Romero and Hopkins pulling Trujillo out of the toilet area, and saw a piece of paper "flutter" into the toilet. A piece of paper taken from Trujillo's mouth matched the piece of paper that dropped into the toilet. The paper had the number "591" written on it. At trial, the government introduced taped conversations discussing, the fact that 591 kilograms of the air-dropped cocaine belonged to "the Colombians." Rodriguez also testified to this fact. Velez testified that he retrieved the paper from the toilet, and that Hopkins gave him the paper retrieved from Trujillo's mouth approximately two to three minutes later. Velez, however, did not see Romero or Hopkins obtain this piece of paper.

According to Federal Rule of Evidence 901(b), "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with [the] circumstances[,]" satisfies the authentication requirement. Fed. R. Evid. 901(b)(4). The district court found that, given the proximity of time and the circumstances surrounding the obtaining of this evidence, the government had authenticated this evidence properly. We agree. In <u>United States v. Smith</u>, this court held that "[t]he government may authenticate a document solely through the use of circumstantial evidence, including the

document's own distinctive characteristics and the circumstances surrounding its discovery." 918 F.2d 1501, 1510 (11th Cir. 1990), cert. denied, 502 U.S. 849 (1991).

Trujillo also challenges the district court's admission of Rodriguez's testimony concerning Trujillo's and Herryman-Perez's having been incarcerated together previously in Cuba and their prior drug involvement. Immediately after Rodriguez testified as to Trujillo's prior incarceration, the district court issued the following curative instruction: "The reference to Cuba and incarceration is stricken and the jury is instructed to disregard that portion of the witness' testimony." We hold that the district court's curative instruction assuaged any potential prejudice that Rodriguez's testimony caused. See United States v. Perez, 30 F.3d 1407, 1411 (11th Cir.) ("When a court gives a direct and explicit curative instruction regarding improper testimony, it supports the court's decision not to grant a mistrial by decreasing the possibility of undue prejudice."), cert. denied, 513 U.S. 1005 (1994). We additionally find that the government provided the district court and Trujillo with sufficient notice that it would rely on evidence of other crimes, including Trujillo's prior drug dealing. Since this evidence meets the requirements of Federal Rule of Evidence 404(b) and United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992), we hold that the district court's evidentiary ruling was not an abuse of discretion.

Trujillo finally challenges Rodriguez's testimony that Fuentes while in custody admitted knowing of the 300 kilograms of cocaine in the van. Trujillo contends that even if the statement was admissible against Fuentes as an admission of a party opponent under

10

Federal Rule of Evidence 801(d)(2)(A), it was inadmissible against Trujillo because it was a hearsay statement not made in the scope of, or in furtherance of, a conspiracy under Federal Rule of Evidence 801(d)(2)(E), because Fuentes made the statement in jail after the conspiratorial activities had ceased. Once again, the district court issued a curative instruction, stating that "any statements made by Mr. Fuentes after his arrest can only be considered against Mr. Fuentes and cannot be considered as to any other defendant." We hold that this instruction cured any prejudice that Rodriguez's testimony may have caused to Trujilllo. See Perez, 30 F.3d at 1411.

### C. Agent Shamas's Testimony

During the government's rebuttal, and several hours before he testified, Agent Michael Shamas returned to the warehouse where he had arrested Fuentes. At the warehouse, Agent Shamas inspected the warehouse door, and later testified that he was unable to see anything from the door when it was closed. This testimony contradicted Fuentes, who had testified that he had looked through cracks in the door on the date of his arrest to determine that he was in danger. Fuentes contends the district court abused its discretion in admitting this evidence, because the government did not qualify Shamas as an expert to render expert testimony concerning this "experiment." We hold that the district court did not abuse its discretion, because Shamas's observation of the door did not require the skill of an expert, as it was not beyond the understanding and experience of an average citizen. See Fed. R. Evid. 702; United States v. Webb, 625 F.2d 709, 711 (5th Cir. Unit B 1980).

11

**D. Sufficiency of the Evidence**

Trujillo next contends that the government presented insufficient evidence to sustain his convictions for conspiracy to import cocaine into the United States, conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. In essence, Trujillo argues that the government failed to link him to any conspiracy or possession of cocaine, because: (1) after conducting a search of his home, arresting officers discovered no contraband or items suggesting drug activity; (2) the government presented no evidence that Trujillo gave Jose the brown paper bag with $10,000 to finance the airdrop, and instead relied on Jose's telling Agent Duarte that Trujillo gave him this money; (3) the testimony of Rodriguez and Castellanos that implicated Trujillo with conspiracy and possession was unreliable because they were government witnesses; (4) the piece of paper detectives took from Trujillo's mouth was erroneously admitted, and the government could not identify Trujillo as the voice on its surveillance tape stating that the Columbians would receive 591 kilograms of cocaine; and (5) Trujillo was not at the warehouse when Fuentes delivered the cocaine.

We review sufficiency of the evidence <u>de novo</u>, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. <u>See</u> <u>United States v. Lumley</u>, 135 F.3d 758, 759 (11th Cir. 1998) (citing <u>United States v. Chirinos</u>, 112 F.3d 1089, 1095 (11th Cir. 1997)). The relevant question in reviewing a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of

12

fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Suba, 132 F.3d 662, 671 (11th Cir. 1998) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). After reviewing the overwhelming evidence presented against Trujillo and other participants in the conspiracy, we hold that the government presented sufficient evidence to sustain all of Trujillo's convictions. The government presented the testimony of various law enforcement agents and conspiracy participants, as well as surveillance tapes to establish that Trujillo played a pivotal role in the conspiracy – namely, providing money and decision-making authority about how the conspirators would distribute the cocaine.

### E. Motions for Mistrial

Trujillo argues that the following aspects of Agent Duarte's testimony warranted a mistrial: (1) Agent Duarte testified that the FBI had reimbursed Jose's expenses and relocated him "for his own protection"; (2) Agent Duarte testified that meetings between several coconspirators occurred at a cock-fighting farm; and (3) Agent Duarte testified during redirect that the purpose of testifying before a grand jury is to determine if probable cause exists to indict someone.[5] Trujillo and Fuentes also assign error to the government's rebuttal closing, when the prosecutor stated that the defense could have but

---

[5] We note that Trujillo also contends that the district court abused its discretion in failing to grant a mistrial after Rodriguez testified about Trujillo's prior incarceration with Herryman-Perez in Cuba. We hold that the district court's curative instruction assuaged any potential prejudice.

13

failed to call Jose as a witness. The district court issued curative instructions after each of these instances.

We review the district court's refusal to grant a mistrial for abuse of discretion. See United States v. Lozano-Hernandez, 89 F.3d 785, 789 (11th Cir. 1996). When a district court issues a curative instruction, we will reverse only if the evidence "is so highly prejudicial as to be incurable by the trial court's admonition." Lozano-Hernandez, 89 F.3d at 789 (quoting United States v. Funt, 896 F.2d 1288, 1295 (11th Cir. 1990)). We find that the district court's issuing of curative instructions remedied any potential prejudice that this evidence and the prosecutor's statement caused. See Perez, 30 F.3d at 1411. Thus, we hold that the district court did not abuse its discretion in refusing to declare a mistrial for Trujillo and Fuentes.

**F. Conspiracy Instruction**

Trujillo and Fuentes contend that the district court erred in using a pattern jury instruction on conspiracy, because the word "scheme" in the instruction had a negative connotation, and the phrase "to try" provided the jury with a lesser standard for actions in furtherance of a conspiracy. The jury instruction, as adopted directly from this circuit's pattern jury instructions, read:

> [U]nder the law, a conspiracy is an agreement, or a kind of partnership in criminal purposes in which each member becomes the agent or partner of every other member. In order to establish a conspiracy offense it is not necessary for the Government to prove that all of the people named in the indictment were members of the scheme, or that those who were members had entered into any formal type of agreement. Also, because the essence of the

14

conspiracy is the making of the <u>scheme</u> itself, it is not necessary for the Government to prove that the conspirators actually succeeded in accomplishing their unlawful plan. What the evidence in the case must show beyond a reasonable doubt is: First, that two or more persons in some way or manner came to a mutual understanding <u>to try</u> to accomplish a common and unlawful plan; and second, that the defendant knowingly and willfully became a member of such conspiracy.

(Emphasis added.)

This court applies a deferential standard of review to a district court's jury instructions. If the instructions accurately reflect the law, this court gives the trial judge wide discretion in determining the style and wording of the instructions. <u>See</u> <u>United States v. Starke</u>, 62 F.3d 1374, 1380 (11th Cir. 1995) (citing <u>McElroy v. Firestone Tire & Rubber Co.</u>, 894 F.2d 1504, 1509 (11th Cir. 1990)). We review a district court's refusal to give a requested jury instruction for abuse of discretion. <u>See</u> <u>United States v. Condon</u>, 132 F.3d 653, 656 (11th Cir.), <u>cert. denied</u>, 118 S. Ct. 1547 (1998). Mindful of this deferential standard, we hold that the district court did not abuse its discretion in using this pattern jury instruction, because this instruction accurately reflects the elements of a conspiracy.

### G. Modified <u>Allen</u> Charge

After deliberating for three days, the jury returned a partial verdict acquitting Lasarte on all counts, acquitting Fuentes on counts one and two and convicting Trujillo on count two. The district court then issued a modified <u>Allen</u> charge, adopted from this circuit's pattern instructions. <u>See</u> Committee on Pattern Jury Instructions, District

15

Judge's Ass'n of the Eleventh Circuit, Pattern Jury Instructions (Criminal Cases), Trial Instruction n. 6 (West 1997); Allen v. United States, 164 U.S. 492 (1896); United States v. Chigbo, 38 F.3d 543, 544-45 (11th Cir.), cert. denied, 516 U.S. 826 (1994). Four days later, the jury convicted Trujillo on the remaining two counts, convicted Fuentes on the third count and could not reach a verdict as to Ruiz. Trujillo and Fuentes argue that the district court erred in giving the modified Allen charge, because it coerced the jury into believing that only a unanimous agreement was acceptable.

Our review of a district court's decision to give an Allen charge is limited to evaluating the coercive impact of the charge. See United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir.) (citing United States v. Elkins, 885 F.2d 775, 783 (11th Cir. 1989), cert. denied, 494 U.S. 1005 (1990)), cert. denied, 517 U.S. 1027 (1996). Since the district court did not poll the jurors to determine the extent of their numerical division, we can reverse their verdict only if we find that the giving of the Allen charge was inherently coercive. See Chigbo, 38 F.3d at 545. We hold that the modified Allen charge given here did not unduly coerce any of the jurors into rendering a verdict. This court has adopted this pattern charge, and it specifically requests that "no juror is expected to give up an honest belief he or she may have as to the weight or effect of the evidence."[6]

**H. Fuentes's Sentencing Enhancement**

---

[6] We also note that this charge could not have been too unduly coercive, as the jury was unable to reach a verdict as to Ruiz after the district court gave it.

At sentencing, the district court found that Fuentes possessed a dangerous weapon during a drug-trafficking crime, and enhanced his sentence two levels pursuant to U.S.S.G. § 2D1.1(b)(1), which provides, "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." Fuentes contends that because he left his gun in a separate office near the front of the warehouse, the district court's finding was clearly erroneous. We review the district court's application of the Sentencing Guidelines de novo, and its findings of fact for clear error. See United States v. Hall, 46 F.3d 62, 63 (11th Cir. 1995).

According to Hall, "[o]nce the prosecution has shown by a preponderance of the evidence that the firearm was present at the site of the charged conduct, the evidentiary burden shifts to the defendant to show that a connection between the firearm and the offense is clearly improbable." Hall, 46 F.3d at 63. At Fuentes's sentencing hearing, the probation office reintroduced photographs depicting the warehouse at the time of Fuentes's arrest. These photographs revealed that Fuentes's gun was in the office area of the warehouse, with the 300 kilograms of cocaine found nearby in and around the warehouse. We hold that Fuentes's gun was present in the warehouse while Fuentes involved himself in the cocaine transaction, and that the district court's finding was not clearly erroneous. See, e.g., United States v. Smith, 127 F.3d 1388, 1390 (11th Cir. 1997) (holding that this court applies this enhancement whenever a firearm is possessed during conduct relevant to the offense of conviction).

Fuentes next argues that the connection between his gun and the cocaine transaction was clearly improbable because he left the gun in a separate office, and because he carried his gun legally as a security guard (he possessed a concealed weapon permit). The district court rejected this argument, finding that this "just indicates that the gun was there for personal security in the event something went wrong in connection with the drug trafficking transaction." We hold that the district court's finding was not clearly erroneous. See, e.g., United States v. Hansley, 54 F.3d 709, 716 (11th Cir.) (finding that a section 2D1.1 enhancement was applicable when agents found a gun in the house where the defendant had engaged in conspiratorial conversations), cert. denied, 516 U.S. 999 (1995); Hall, 46 F.3d at 64 (finding that a gun located near several drug-related objects in a house where conversations concerning drug importation occurred satisfied section 2D1.1 enhancement). Thus, we hold that the district court did not err in enhancing Fuentes's sentence.[7]

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the judgments.

**AFFIRMED.**

---

[7] Fuentes also contends that the district court erred in not granting him a downward departure pursuant to Sentencing Guidelines section 2D1.1(b)(4). Since we hold that the district court did not err in enhancing Fuentes's sentence pursuant to 2D1.1(b)(1), this contention is moot.