[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10661

_____

D.C. Docket No. 3:10-cr-00101-MCR-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GERARD M. DILEO,
DENNIS M. CARONI,
JOSEPH GEORGE PASTOREK, II,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

(September 1, 2015)

Before MARTIN and ANDERSON, Circuit Judges, and COTE, District Judge.

_____

* Honorable Denise Cote, United States District Judge for the Southern District of New York, sitting by designation.

PER CURIAM:

In September 2010, a federal grand jury charged Dennis Caroni, Gerard M. DiLeo, Theodore G. Aufdemorte, Jr.,[1] and Joseph George Pastorek, II, with one count of conspiracy to distribute drugs and one count of conspiracy to commit money laundering. The indictment charged that DiLeo and Pastorek were physicians licensed by the state of Louisiana with the authority to prescribe controlled substances in Schedules II through V. Using Caroni and Aufdemorte's company, Global Pain Management, LLC ("Global Pain"), the four codefendants allegedly conspired to unlawfully prescribe Schedule II and III controlled substances through prescription practices done outside the usual course of medical practice and for other than legitimate medical purposes. The indictment further alleged that the offense involved "a mixture and substance containing" multiple prescription drugs, and that the drugs had caused at least one death.

Caroni and Aufdemorte formed Global Pain in January 2004 to operate and manage pain management clinics under various names in the New Orleans area. In 2005, Caroni opened a Global Pain pain management clinic in Pensacola that stayed open for approximately two weeks. The DEA began surveilling one of Global Pain's clinics in November 2005 and identified five separate incidents in which individuals who had previously been convicted of controlled substances

---

[1] The indictment against Aufdemorte was later dismissed.

charges visited the clinic.  In January and March 2006, two undercover DEA agents tried to obtain prescriptions for controlled substances from Global Pain without a legitimate medical reason but neither agent was successful.

In February 2008, the Government obtained search warrants for the offices of two of Global Pain's clinics and for Caroni's grandmother's house.  A jury trial was conducted from October 19, 2011, through November 23, 2011.  Dr. Ted Parran, a government-retained expert in the field of pain management, addiction medicine, and the prescription of controlled substances, reviewed 96 patient files that were seized by the government.  Dr. Parran opined that the prescription practices of Global Pain were dangerous, not consistent with the usual course of medical practice, and not for legitimate medical purposes.  Another Government pain expert witness, Dr. Robin Hamill-Ruth, reviewed files from the Pensacola clinic and testified that the prescribing done there was unsafe and outside the usual course of medical practice.  Dr. Carol Warfield, Caroni's expert in pain management, reviewed the same patient files that Dr. Parran had reviewed.  She concluded that the pain medications were prescribed to patients for legitimate medical reasons and were done so within the accepted standard of care of the practice of pain medicine.

Former office staff testified that follow-up visits at the clinics took an average of five minutes per patient.  At some point during the conspiracy, patients

3

were able to pay for two two-week prescriptions, with the second prescription post-dated, in a single visit; they would pick up the second prescription later, without having to see a doctor.  Global Pain eventually required patients to make two clinic visits per month where the second visit would entail the patients receiving their prescriptions after only briefly seeing a doctor.  During the week after Hurricane Katrina occurred, Global Pain allowed its patients to pick up their prescriptions without having to see a doctor or enter the clinic as long as they paid for their prescriptions.

The patient files revealed that Global Pain was aware that several of its patients suffered from drug addiction, and some of those patients' families asked Global Pain to not give them access to pain medication.  Patients testified that they were never examined by a doctor at the clinics even though some of their respective files indicated that an examination was performed.  Clinic staff testified that the exam rooms either contained no examination tables or that the tables were not used because they never changed the tables' paper covering.  One of the doctors testified that the only physical examination he conducted was to check a patient's heart and lungs with a stethoscope.  Patients often appeared to be under the influence when they were in the waiting room.  Prescriptions were sometimes provided despite the doctors stating that the medication was not needed.

4

Global Pain employees testified that patients were charged between $100 to $400 per visit based on whether they were receiving Schedule II drugs or Schedule III, IV, or V drugs. Caroni called the clinics regularly, though later on he was rarely physically present, and he instructed one of his employees to give him daily updates of the cash totals. He established a patient referral program where patients could earn a free visit if they referred five patients to Global Pain. Caroni told at least two employees that what patients did with the prescriptions was not his business. One doctor testified that he walked away from Global Pain's $500,000 annual salary without any future job prospects because he did not want to be a part of a "pill mill."

Global Pain did not accept insurance claims, and patients had to pay in cash until 2007, at which point it also began accepting some payments by check, money order, and credit card. At some point in time, Global Pain's money was kept at Caroni's grandmother's house for approximately one month because the clinic did not have a bank account. It frequently changed banks because bank managers closed the company's accounts as a result of Caroni's behavior. Caroni and DiLeo opened approximately 57 bank accounts at 15 different banks during the course of the conspiracy. Caroni, or other employees on his behalf, deposited large sums of cash into the bank accounts almost daily, and sometimes into more than two separate bank accounts. Each deposit was always under $10,000 to avoid the

5

reporting requirements.  In total, Global Pain deposited approximately $8,557,205 from January 2004 through December 2007.  After a jury trial, Caroni and DiLeo were found guilty of both drug and money laundering conspiracies, and Pastorek was found guilty of the drug conspiracy.  The Defendants raise numerous challenges to the judgment of the district court.  We address each in turn.

## I. DISCUSSION

A.    Venue

DiLeo argues that the Government failed to prove venue and that the district court erred when it refused to allow the defense to argue it was missing or submit a jury instruction on the issue. [2]  The parties stipulated that Pensacola – the location of the third clinic that Caroni ran for a short time – was located in the Northern District of Florida for venue purposes.  Specifically, the parties agreed that "the activities within Pensacola, and in Escambia County, that those activities, Pensacola and Escambia County are situated within the Northern District of Florida for venue purposes."  During the charge conference, the Government attorney stated that the Defendants had stipulated to venue while defense counsel countered that they had just stipulated that Pensacola was in the Northern District.  The court suggested that the Defendants were "long past a venue challenge."  After reading the stipulation, the court stated that if they were seeking an instruction on

---

[2]    Both Caroni and Pastorek adopt this argument.

venue, they needed to get working on it, because it was not something that had ever been presented to her before as an issue and it was really a legal question that needed to be decided first and foremost. After the Government attorney stated that venue had never been raised before, counsel for one of the Defendants stated that he did not realize that it was an issue until now. The Government attorney replied that he did not know how the Defendants did not know because he mentioned why they were in Florida in his opening statement. The court told defense counsel that he should research and prepare something for her because it was not something she had anticipated.

Later that same day, the court told the defense that it could not argue venue to the jury and then refused to instruct the jury on venue. At first, she stated that they could bring a proposed instruction later but then she scolded the defense for not raising it sooner and stated that they could not bring the issue in a proposed instruction at all.

DiLeo argues that the district court committed structural error when it prohibited defense counsel from arguing the Government failed to prove venue, and reversible error when it refused to give the requested jury instructions on venue.[3]

---

[3]    The Defendants did not waive this argument by raising it when they did: "when an indictment contains a proper allegation of venue so that a defendant has no notice of a defect of

We have stated that venue is an essential element in a criminal case and should not be treated as a mere technicality. United States v. Snipes, 611 F.3d 855, 865 (11th Cir. 2010). It is guaranteed by the Constitution and a question of fact for the jury. Id. at 866. We have also stated:

> A conspiracy may be prosecuted in the district where it was formed or in any district where an overt act was committed in furtherance of its objects. An overt act may be that of only a single one of the conspirators and need not be itself a crime. An individual conspirator need not participate in the overt act in furtherance of the conspiracy. Once a conspiracy is established, and an individual is linked to that conspiracy, an overt act committed by any conspirator is sufficient.

United States v. Schlei, 122 F.3d 944, 975 (11th Cir. 1997) (internal citations and punctuation omitted). Our precedent states that it is reversible error to fail to instruct when the defendant requests it and the testimony puts venue at issue. United States v. Green, 309 F.2d 852, 856-57 (5th Cir. 1962).[4] We have stated that although venue is an essential element, it is not a substantive element, requiring per se reversal when instructions are sought but not given. United States v. White, 611 F.2d 531, 536 (5th Cir. 1980) (holding that no plain error was committed when the

---

venue until the Government rests its case, the objection is timely if made at the close of evidence." United States v. Daniels, 5 F.3d 495, 496 (11th Cir. 1993). Here, the indictment alleged venue and thus, Defendants' objection to venue was timely. Defendants did not waive the objection by failing to raise it before trial.

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

district court failed to instruct on venue).  The Supreme Court has held that harmless error applies when the trial court fails to instruct on an essential element of a crime, Neder v. United States, 527 U.S. 1, 9, 119 S. Ct. 1827, 1834 (1999), and other courts have held that this specific error should be reviewed for harmless error, United States v. Casch, 448 F.3d 1115, 1117 (9th Cir. 2006).  In Casch, the court employed a standard that if the evidence that the defendant committed the conspiracy in the district where convicted was substantial and uncontroverted, the district court's error was harmless.  Id.

While the district court erred, the evidence of venue was uncontroverted, making that error harmless.  After the Defendants entered into their conspiracy, Caroni, DiLeo, and two others made plans to open the clinic in Pensacola.  Caroni and DiLeo hired and trained Dr. Klug to be the prescribing physician.  The same unlawful practices used in New Orleans were carried over to the Pensacola Global clinic.  When Dr. Klug asked Dr. DiLeo for guidance because of his inexperience with respect to pain management, Dr. DiLeo instructed him to just prescribe what the patients had previously been receiving.  And with respect to physical exams, Dr. Klug testified that he merely listened with a stethoscope to the patients' hearts and lungs.  Expert Hamill-Ruth testified that Klug's prescribing was outside of the standard of care and inconsistent with the operation of a legal clinic.  Caroni

opened two bank accounts in Pensacola in the name of the clinic in which money from the clinic was deposited.

Defendants also procured facilities to house the Pensacola clinic and operated it for eight days.  Defendants sent several employees to either run the office or help train those working there.  They procured an apartment for one of those employees, whom they sent from the office in Covington to work at the new clinic.  Even though the three Defendants never traveled to the Northern District of Florida, it was abundantly clear that it was part of their plan and conspiracy.  Although there was strong evidence that the activities in Pensacola were in fact criminal, venue exists under our case law "in any district where an overt act was committed in furtherance of its objects . . . [and the] overt act . . . need not be itself a crime."  Schlei, 122 F.3d at 975 (internal citations and punctuation omitted).  The foregoing evidence is uncontroverted.  There is overwhelming evidence that overt acts in furtherance of the conspiracy occurred in Pensacola.  In sum, there was overwhelming evidence that venue existed there.  Thus, any error was harmless.

B.    Deliberate ignorance

Pastorek argues that the district court erred when it instructed the jury on deliberate ignorance.[5]  He asserts that this court has stated that the instruction should be given only in rare cases where the facts point in the direction of

---

[5]    Caroni and DiLeo adopt this argument.

deliberate ignorance, but that in this case, the Government argued that the Defendants knew what they were doing and took steps to cover their tracks. The two battling theories of the case were that the Defendants knew the controlled substances were being issued outside their usual course of medical practice or that the substances were being prescribed pursuant to a legitimate medical purpose. Neither, he argues, supports the deliberate ignorance factual predicate of defendants being subjectively aware of a high probability that controlled substances were being issued outside the usual course of medical practice and that they deliberately contrived to avoid discovering or confirming this. He further argues that the error was not harmless: giving the instruction, without the proper factual predicate, runs the risk that the jury will convict based on a belief that the Defendants were negligent or reckless in failing to learn of the alleged illegal activity, rather than that they had actual knowledge of it.

This court gives wide discretion to the style and wording of instructions on deliberate ignorance. Such an instruction is justified when the facts "support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991). We have stated that when the deliberate ignorance instruction is correctly given, and because by its own words

11

the instruction did not apply because there was insufficient evidence to prove deliberate ignorance, there was no reason to believe that the jury convicted the defendant on it and such an instruction is harmless per se. United States v. Stone, 9 F.3d 934, 939, 941-42 (11th Cir. 1993). In Stone, we determined that the instruction was clear in setting as a precondition of finding the defendant guilty of deliberate ignorance that there was proof beyond a reasonable doubt that he deliberately kept himself ignorant. Id. at 937-38. Rejecting the defendant's argument that the jury had not followed the instruction, we reasoned that as long as one theory of conviction was supported by evidence, the error is harmless. Id. at 939. Further, where one theory was supported, the jury will be presumed to have made the proper choice. Id. Finally, we rejected the ideas that a jury instructed on deliberate ignorance in the absence of evidence would employ a reckless or negligence standard or that by finding this error harmless, the appellate court substituted itself for the jury. Id. at 941.

Stone thus stands for the principle that a jury, when presented with two alternate theories, will take the instructions to heart and apply them. Here, there was evidence that the Defendants ignored evidence that their patients were abusing the prescribed substances: they did not order routine and inexpensive drug screens to ensure that the patients were complying with the prescriptions, they refilled prescriptions early without questioning, they did not administer physical exams to

12

ensure an underlying pathology, and they wrote blanket prescriptions based upon previous doctors' scripts. Additionally, as discussed below, there was sufficient evidence to support the alternative theory. Thus, it was not error to instruct on deliberate ignorance.

### C. Prejudicial Evidence

Caroni argues that his motion for mistrial should have been granted after the jury was improperly exposed to evidence about two patients' death (i.e., the deaths of J.P. and E.A.A.).[6] He also supported his mistrial motion with the fact that the jury was exposed to three letters from parents of two patients – complaining to the clinics or to the Louisiana State Board of Medical Examiners ("LSBME") that the clinics' prescriptions caused overdoses, and urging the clinics to stop prescribing to their son. There were four such letters, all admitted for the purpose of showing that Defendants had notice that their prescriptions were being misused and were creating dangerous health conditions. After it became apparent that the clinics had not received three of the four letters, the jury was instructed that Defendants had had no knowledge of those letters, which therefore could not serve as notice to them that their prescriptions were being misused.

The prosecution stated, during opening argument, that Defendants were responsible for the deaths and had ignored letters from the patients' parents asking

---

[6]    Both Pastorek and DiLeo adopt this argument.

13

them to cease giving the patients drugs. The jury heard from one patient's (J.P.'s) girlfriend who was with him when he had a seizure and crashed his car into a tree, killing him. The Government put the state trooper who responded to the accident on the stand as well as the coroner who issued the death certificate but did not do the autopsy. The director of the lab testified and introduced into evidence the toxicology report, and opined that J.P.'s level of methadone was sufficient to cause death. After receiving that toxicology report, J.P.'s autopsy report was modified to reflect that the cause of death was an overdose. However, the director of the toxicology lab later testified that he had not conducted the tests himself or done the analyses underlying the report, causing the defense to move to strike his testimony. Similarly, the other victim's (E.A.A.'s) daughter testified about her mother's drug addiction and death. After a friend also testified, the prosecution admitted that it did not have the person who performed the toxicology report available to testify, and therefore the prosecution admitted that it could not prove the cause of death.

At that point, the Justice Department advised the prosecution that it should concede the inadmissibility of the autopsy evidence. The court then instructed the jury that it would not be asked to consider whether the deaths resulted from the conspiracy charge, and that it must not consider that part of the indictment. The court instructed the jury to disregard all of the evidence introduced about the deaths. In particular, the jury was instructed as follows:

14

[Y]ou will not be asked in this case to consider whether death resulted to [J.P.] and/or [E.A.A.] from the conspiracy charged in the indictment.  And you must not consider this part of the indictment in any way for any purpose during your deliberations.  As a result, you are instructed that you must disregard all of the evidence introduced in the trial regarding the circumstances surrounding and the cause of the deaths of [J.P.] and [E.A.A.].  This would include all of the testimony of the following witnesses: the toxicologist, Robert Middleberg; the coroner, Tom Wilson; the Alabama Trooper, James Ray; and the medical examiner, Dr. Emily Ward.

    You must also disregard portions of the testimony of the following witnesses:  Lisa Riddle, who was [E.A.A.'s] daughter; Joyce Bohannon, who we heard from yesterday afternoon, who was [E.A.A.'s] friend; and then, Hollie Thompson, who was [J.P.'s] fiancé.  You must disregard the portions of their testimony that specifically referred to the circumstances surrounding and the cause of their deaths.

Docket 656:25:3-27:13 (format changed).  This contemporaneous instruction was repeated almost verbatim in the court's final instructions to the jury.

Caroni also identifies as prejudicial letters from a patient's parent to the clinic that expert Dr. Parran read into evidence.  The letters asked the clinic to stop prescribing to her son because he almost died of an overdose.  The government argued that the letters were relevant to show that the defendants knew what their actions were causing.  This parent wrote three letters, but only the first was received before the patient was discharged by the clinic.  Although the government conceded that the defendants had not received the last two letters before the

15

patient's final office visit, the court allowed the mother to testify why she had written the letters and to identify the letters. The court gave a limiting instruction with respect to the two letters which were not received before the patient's final office visit. Expert Dr. Parran also discussed another patient whose mother had written a letter of complaint to LSBME, but the intended copy of that letter was never received by the defendants. The court struck that letter, but stated that the jury could consider the patient's mother's testimony about writing the letter and the fact that she had made a complaint.

Caroni had moved for a mistrial after the government rested, which the court denied. Caroni argued that the evidence was so prejudicial that, even though curative instructions were given, they could not cure the damage done.

We review a district court's refusal to grant a mistrial for an abuse of discretion. United States v. Trujillo, 146 F.3d 838, 845 (11th Cir. 1998). "The decision of whether to grant a mistrial lies within the sound discretion of a trial judge as he or she is in the best position to evaluate the prejudicial effect of improper testimony." United States v. Perez, 30 F.3d 1407, 1410 (11th Cir. 1994). "When a curative instruction has been given to address some improper and prejudicial evidence, we will reverse only if the evidence 'is so highly prejudicial as to be incurable by the trial court's admonition.'" Id. (quoting United States v. Funt, 896 F.2d 1288, 1295 (11th Cir. 1990)).

16

In United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012), we held that the admission of autopsy reports and testimony about them by a physician who was not their author was a violation of the Confrontation Clause. We determined that the admission of the reports and the testimony was not harmless. Because it was a constitutional error, we reviewed under a more stringent standard: "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 1235. We stated that we could not ignore the powerful impact the reports must have had, and we also noted that the jury was allowed to consider the testimony concerning seven deaths. Id. Furthermore, knowledge of the deaths undermined the defendant's good faith defense. Id. at 1236.

Unlike in Ignasiak, the prejudicial evidence about the deaths in this case was excluded, and the jury was instructed not to consider it. Additionally, the jury was instructed that the clinic did not receive the three challenged letters and the jury was instructed that it could consider those letters only for the limited purpose of revealing what the two patients' families thought of the clinic but not as notice to the clinic or the defendants about the effect of the prescriptions.

Because the evidence about the deaths was excluded, there was no Confrontation Clause violation and thus we need not employ the more stringent standard of review that the court used in Ignasiak. Because the court gave clear

17

instructions to the jury to disregard the evidence, we instead review for whether the evidence was so highly prejudicial as to be incurable.  Perez, 30 F.3d at 1410.

Our careful review of the entire record persuades us that the jury's exposure to the evidence relating to the two deaths and to the challenged letters was not so highly prejudicial as to be incurable. As noted, the jury was clearly instructed – both shortly after the exposure to the inadmissible evidence of the deaths and in the final instructions – to "disregard all of the evidence introduced . . . regarding the circumstances surrounding and the cause of the deaths."  Similarly, strong and proper curative instructions were given at both times with respect to the challenged letters.  With respect to the latter, there was ample other evidence that the defendants were aware that the prescriptions were causing or contributing to addiction or overdoses. With respect to the exposure to the evidence of the deaths, the jury is presumed to have followed the clear instructions to disregard same.  Our careful review of the totality of the evidence persuades us that the jury could and did do that.

In its closing arguments, the government did not comment at all on the death evidence that was ruled inadmissible.  Moreover, with respect to both deaths, the jury was also exposed to significant evidence that indicated either that the death was not in fact caused by the defendants' prescriptions or that eroded the prejudicial effect of the inadmissible evidence.  With respect to J.P., the jury was

exposed to evidence that he had obtained 120 methadone tablets from a Tennessee clinic a week before his fatal automobile accident, thus eroding any causal link between J.P.'s death and these defendants' prescriptions.  The jury could very readily, and most probably actually did, follow the judge's instruction to disregard all of the evidence tending to link the drugs prescribed by these defendants as  a cause of J.P.'s death.  With respect to E.E.A., the jury was also exposed to evidence that she had cervical cancer, thus eroding the prejudicial impact of the jury's exposure to the inadmissible evidence with respect to her death, and making it easier for the jury to follow the judge's instruction.  Moreover, there was ample other evidence that the strength and combination of the drugs being prescribed by these defendants, and their modus operandi, had the potential to cause serious harm, and ample other evidence that defendants' prescriptions had actually caused overdoses.  In light of the totality of the evidence in this case, we do not believe that the inadmissible evidence that the jury was clearly instructed to disregard was so highly prejudicial as to be incurable.

    With respect to the totality of the evidence in this case, unlike the Ignasiak case, the evidence of these defendants' guilt was strong.  Numerous patients and former employees testified that the drugs were prescribed notwithstanding the complete absence of, or only cursory, physical examinations.  They also testified that patients were able to obtain prescriptions despite obvious indications of

19

addiction, abuse of the drugs, and doctor-shopping.  There was evidence that the number of patients the doctors saw each day was very large; that patients were offered bonuses for referrals; and that patients' dosages were increased upon request (i.e., not based upon demonstrable need) and in spite of drug screening indicating that the patients were not taking the drugs and, in some cases, were taking street drugs.  There was significant evidence from employees, including Dr. Klug, that defendants Caroni and DiLeo actually said that what the patients did with the drugs after they left the office was none of their business or concern.  And there was evidence that patients were selling some of the drugs prescribed, and at least some evidence that co-conspirator Caroni was aware of that.  Dr. Klug also testified that, when he sought guidance because of his own inexperience with pain management, Dr. DiLeo advised him to just prescribe the same controlled substances that the patient had been receiving.  The evidence showed that defendants charged fees depending upon the type and strength of the controlled substance, much more like drug dealers than like professionals who base their fees on the time expended and/or the complexity or value of the service.  Significant testimony also came from Dr. Lonseth, who brought his family to New Orleans from California to accept a position with Global Pain at a salary of $500,000.  After observing the operation for a less than a month, he walked away from the $500,000 salary (notwithstanding he had no other current offer) because he thought

20

the operation was a "pill mill."  Two former staff members also estimated that about three-fourths of the patients were there to support their addictions.  Although there was some conflict in the expert testimony, the foregoing evidence provides strong support for the opinions of the two government experts – Dr. Parran and Dr. Hamill-Ruth – that the operation of Global Pain was inconsistent with the legal requirement that prescriptions for controlled substances must be issued for legitimate medical purposes in the usual course of a professional practice.

In sum, we cannot conclude that the district court abused its discretion in denying defendant's motion for a mistrial.


D.    Sufficiency of evidence – conspiracy

Caroni argues that the evidence was legally insufficient to support his conviction for conspiring with his co-defendants to run an illegitimate practice.[7] Under 21 CFR § 1306.04(a),  "a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  The indictment alleges that DiLeo, Pastorek, and Caroni conspired to unlawfully distribute Schedule II, III, and IV controlled substances through prescription practices done outside the usual course of medical practice and for other than legitimate medical

---

[7]    Both Pastorek and DiLeo adopt this argument.

purpose.  Caroni asserts that the Government's theory was that the clinics were pill mills but yet the clinics had employed nine doctors and only two were indicted. Caroni asserts that the Government alleged, and had to prove, an entirely corrupt practice.  He also argues that the files reviewed by the experts were not statistically representative of the whole practice.

We review questions about the sufficiency of the evidence de novo, "viewing the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Sosa, 777 F.3d 1279, 1289 (11th Cir. 2015) (internal quotations omitted and alterations adopted).  Further, "we will affirm a conviction where 'a reasonable jury could find the defendant's guilt beyond a reasonable doubt.'"  Id. (quoting United States v. Utter, 97 F.3d 509, 512 (11th Cir. 1996)).

Caroni cites no cases that require the Government to show that the entire practice was illegitimate.  This would be an unreasonable burden and allow a completely illegal clinic to evade prosecution by having a few legitimate patients. Rather, the Government needed to prove that there was very substantial illegal activity occurring at the clinic, thus removing any reasonable doubt that unlawful prescriptions were being issued by mistake or through negligence.[8]  Thus, the

---

[8]    The district court expressly instructed the jury that "negligence, mistake or carelessness is not a sufficient finding of knowledge."

selection of the files for the experts to review did not need to precisely reflect the composition of the clinic's patient population; rather, it had to demonstrate that the illegal behavior was substantial and it did just that.

In United States v. Joseph, 709 F.3d 1082 (11th Cir. 2013), we upheld a jury's finding of an illegitimate practice. There, we pointed to the defendant's prescription of large quantities of controlled substances, the large number of those prescriptions, failure to do physical examinations, prescriptions to patients knowing they were giving them to others, and no relationship between the drug prescribed and the treatment of the condition alleged.

The evidence in this case was similar to that in Joseph. As set forth in the immediately preceding Part C. of this opinion, there was ample evidence to support the jury's verdict. And while there was some evidence that the Defendants became more careful about doctor shopping and misuse of prescriptions in the last year of the clinic, a reasonable jury could have concluded this was a response to the shutting down of other pain management clinics by the DEA and an effort to evade detection.

23

E.    Sufficiency of evidence – money laundering

Caroni argues that the Government produced insufficient evidence to prove promotion money laundering.[9] To prove promotion money laundering, the Government must show not only that the money was the result of illegal activity but also that it was spent on promoting the illegal activity. Caroni argues that the evidence only showed that cash was deposited into bank accounts, using simple graphs prepared by the agent.

Caroni is correct that our precedent requires the Government to show that the deposited money was intended promote the conspiracy. In United States v. Calderon, we reversed a conviction because the Government only showed that the Appellant knew that the money was ill-gained but never put on any evidence that the Appellant intended to do more than conceal the money. 169 F.3d 718, 721 (11th Cir. 1999). There was no evidence of how the money was to be spent once it was deposited or any evidence of how her actions furthered the underlying drug trafficking. Id.

Our United States v. Martinelli, 454 F.3d 1300 (11th Cir. 2006), decision approved a district court's instruction that the jury had to find that the defendant engaged in the financial transaction with "the intent to promote the carrying on of such specified unlawful activity" and that "[t]he term with the intent to promote the

_____

[9]    DiLeo adopts this argument

24

carrying on of the specified unlawful activity means that the defendant must have conducted or attempted to conduct the financial transaction for the purpose of facilitating or making easier or helping to bring about the specified unlawful activity as has been defined." Id. at 1318. We stated that with such instructions, "the jury could not have found Martinelli guilty if it believed the financial transactions were undertaken for legitimate, non-fraudulent business expenses." Id.

Here, the jury was instructed with the same pattern jury instructions as in Martinelli. The agent who provided evidence about the monetary transactions testified that the funds at issue were used to pay overhead, rent, and malpractice insurance. Further, in Caroni's deposition in a civil case, which was entered into evidence, he testified that they used the funds from Global Pensacola to pay "bills and whatnot." Thus, the proceeds of the unlawful activity were deposited into numerous bank accounts and then spent to pay overhead, rent, malpractice insurance, bills, and whatnot – all expenses incurred to promote and continue the operation of the conspiracy to unlawfully dispense controlled substances. Accordingly, there was sufficient evidence that the funds were spent to promote the illegal practice.

F.    Indictment amendment

Caroni argues that his Fifth Amendment rights were violated when the jury was charged in the disjunctive but the indictment read in the conjunctive.[10]  Count One charged the Defendants with engaging in a conspiracy to unlawfully dispense controlled substances through prescription practices done outside the usual course of medical practice and for other than legitimate medical purposes.  However, the Government's proposed jury instructions stated that the jury only had to find one or the other.  Caroni objected and asked for a ruling before opening arguments. The district court instructed the lawyers to avoid the standard in their openings and did not rule until 20 days into the trial, after the Government had rested.  It overruled Caroni's objection and instructed the jury in the disjunctive.  Caroni argues that the charge impermissibly expanded the indictment by broadening the possible bases for conviction.

Caroni points to our decision in United States v. Cancelliere, 69 F.3d 1116 (11th Cir. 1995), where we held that the Government had to prove willfulness even though the statute did not include that language because the Government had put the word in the indictment.  We so held because the entire defense was based on the defendant's lack of willfulness and the Government did not seek to have willfulness removed until after the close of evidence.  Here, Caroni contends that

---

[10]    Both Pastorek and DiLeo adopt this argument.

26

his entire defense was prepared based on the grand jury's charges and changing the rules midstream was highly prejudicial.

We have explained that a constructive amendment "takes place 'when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.'" United States v. Mozie, 752 F.3d 1271, 1283 (11th Cir. 2014)) (quoting United States v. Dortch, 696 F.3d 1104, 1111 (11th Cir. 2012)).  We have stated repeatedly that when an indictment charges several means of violating a statute, a conviction may be obtained on proof of only one of the means.  Id. at 1283-84.  In Mozie, we explained that in Cancelliere, there were some key differences.  One was that willfulness was not an alternative means because it was not in the statute.  Id. at 1284.  Second, Cancelliere was different because the defendant based his entire defense on disproving the mental state that was removed.  Id.  Finally, we stated that to the extent Cancelliere supported Mozie's position, it was inconsistent with cases that came before it and they would trump Cancelliere.  Id. at 1285.

Caroni's argument fails for several reasons.  This case is more like Mozie than Cancelliere.  The disjunctive instruction was not error.  Section 1306.04(a) of the code of Federal Regulations provides an exception to the prohibitions found in § 841 that ban the sale and provision of certain drugs.  That regulation permits prescriptions for controlled substance if they are "issued for a legitimate medical

27

purpose by an individual practitioner acting in the usual course of his professional practice." Thus, under the plain language of the regulation, in order to qualify for the exception, a defendant must have provided the prescription for both a legitimate medical purpose and while acting in the usually course of his profession. Without both, the defendant is subject to prosecution. Accord Joseph, 709 F.3d at 1094 (citing the regulation and holding "[i]f a prescription is issued without a legitimate medical purpose or outside the usual course of professional practice", it is subject to criminal penalties). Hence, the Government needed only to prove one of the two prongs and the Defendants were on notice because the language of the section clearly mandated that requirement.

G.    Caroni's sentence

1. General verdict precluded sentencing to an underlying object offense.

Caroni asserts that in a multi-object conspiracy, a general verdict from the jury precludes the court from sentencing the defendant to an underlying object offense unless the court finds beyond a reasonable doubt that the defendant conspired to commit that particular object offense. He argues that his sentences should be limited by his three-year statutory maximum sentence for Count 1 because the jury did not specifically find that he was guilty of conspiring to distribute Schedule II drugs. He also contends that the district court erred by failing to separately calculate his offense level for Count 2 under U.S.S.G. § 2S1.1

28

to determine what his highest guideline range was.  He argues that the court's use of § 2D1.1 to calculate his offense level for Count 2 in conjunction with the application of the statutory maximum sentence for Count 2 is unconstitutional.

Pursuant to 18 U.S.C. § 1956, a person convicted for money laundering faces a maximum sentence of 20 years' imprisonment.  18 U.S.C. § 1956(a)(1)(B)(ii).  The Sentencing Guidelines dictate that closely related counts shall be grouped together for sentencing purposes.  U.S.S.G. § 3D1.2.  In a case where the defendant is convicted of money laundering and convicted of the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to § 3D1.2(c), and the highest offense level shall be applied.  U.S.S.G. § 2S1.1, comment. (n.6); U.S.S.G. § 3D1.3(a).  While typically it is necessary to determine the offense level for each of the counts, the formal determination of the offense level is unnecessary where it is clear that one count cannot have a higher offense level than another.  U.S.S.G. § 3D1.3, comment. (n.2).

Money laundering offenses are covered by § 2S1.1 of the Guidelines.  U.S.S.G. § 2S1.1.  Under § 2S1.1, the offense level of the underlying offense from which the laundered funds were derived is to be applied as long as it can be determined.  U.S.S.G. § 2S1.1(a)(1).  Offenses involving a conspiracy to distribute controlled substances are covered by § 2D1.1 of the Guidelines.  U.S.S.G. § 2D1.1.

29

In determining the drug quantity for purposes of § 2D1.1, types and quantities of drugs not specified in the count of convictions may be considered. U.S.S.G. § 2D1.1, comment. (n.12)(2011).[11]  Additionally, the court may approximate the drug quantity by considering various factors, including financial and business records. Id.

Caroni's claim fails because the district court properly calculated his guideline range and neither of his sentences exceed their respective statutory maximum penalties. Because he was convicted of laundering the money that he derived from the drug offense, the district court properly grouped his counts. U.S.S.G. § 2S1.3, comment. (n.6). Because Caroni's base offense level under § 2S1.1 was set to the offense level of his underlying drug offense, and he was eligible for the role adjustment in connection with either provision, he had the same total offense level for both counts. See U.S.S.G. § 2S1.1(a)(1). As such, it was unnecessary to independently determine his offense level for both counts, and either one could be used as the highest offense level. See U.S.S.G. § 3D1.3(a); U.S.S.G. § 3D1.3, comment. (n.2). He was subsequently sentenced to concurrent sentences of 36 months for Count 1 and 240 months for Count 2, both within his respective statutory maximum penalties.

---

[11]    The district court employed the 2011 Guidelines because the trial took place that year.

30

Although Caroni argues that the court should have limited his sentence for Count 2 with his statutory maximum penalty for Count 1, he offers no authority to support this position, and the money laundering guidelines specifically require the use of the drug offense guidelines in cases like this without any directive to alter the respective statutory penalties. [12]  Finally, he offers no authority to support his position that the court was not entitled to consider the Schedule II drugs involved in the drug offense under the Guidelines in determining his drug quantity.  See U.S.S.G. § 2D1.1, comment. (n.12).  Accordingly, Caroni's challenge fails.

2.  Calculation of drug quantity

Caroni challenges the court's calculation of his drug quantity.  He argues that the district court clearly erred in determining the drug quantity based upon his assertion that many of the drugs were prescribed legitimately and the court was required to exclude those drugs.

This Court reviews the district court's interpretation of the Sentencing Guidelines de novo and accepts its factual findings unless clearly erroneous. United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir. 2005).  In order to be clearly erroneous, the finding of the district court must leave this Court with a "definite and firm conviction that a mistake has been committed."  United States v.

---

[12]    We also reject Caroni's arguments based on Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), and United States v. Allen, 302 F.3d 1260 (11th Cir. 2002), because the pertinent statutory maximum is the one for money laundering.

Rothenberg, 610 F.3d 621, 624 (11th Cir. 2010).  However, a factual finding cannot be clearly erroneous when the fact finder is choosing between two permissible views of the evidence.  United States v. Saingerard, 621 F.3d 1341, 1343 (11th Cir. 2010).  For sentencing purposes, the government bears the burden of establishing drug quantity by a preponderance of the evidence.  United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005).  The court must ensure that the government carries this burden by presenting reliable and specific evidence.  United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995).

The district court did not rely on a limited subset of the patient files to conclude that all of the patients received illegitimate prescriptions,  but instead analyzed all of the identified patient files to reach the conclusion that all of the prescriptions were not for a legitimate medical purpose and were outside of those usual course of medical practice.  Thus, with respect to all of the controlled substances for which Caroni was held responsible, the district court made a finding of fact that they were not prescribed for a legitimate medical purpose.  The evidence showed that patients were able to pick up their prescriptions, often without seeing a doctor, simply by making the required payments.  Patients had to pay in all cash, and prescriptions were often given out to patients with addiction problems, to patients that appeared to be under the influence, and in situations where the prescribing doctor believed that medication was not necessary.

32

Furthermore, the government and the court excluded many of the patient files from the original 96 patient files that were seized and reviewed.  The PSI initially considered 68 of the patient files, and only 67 were considered at sentencing following the government's concession that one of the patients' prescriptions should not be counted.

Although Caroni argued that some of the patient files contained information suggesting that the patients legitimately needed the medication, he offered no reliable evidence to establish that the medications were for a legitimate medical purpose or within the usual course of medical practice.  Caroni submitted the conclusions of his expert witness, Warfield, but the district court correctly noted that the weight of her opinion had to be tempered by the jury's guilty verdict.  Accordingly, the district court did not clearly err in determining that a preponderance of the evidence supported the drug quantity specified in the PSI.

3.  Substantively unreasonable sentence

Finally, Caroni argues that his sentences are substantively unreasonable.  He contends that the court impermissibly concluded that the conspiracy involved Schedule II drugs.  Additionally, he points to the sentencing disparity between his sentences and those of his codefendants to argue that the district court made a clear error in judgment.  He also argues that the court improperly considered evidence of

33

the patient deaths and of Mark Artigues's[13] conduct, evidence that he argues was not properly in the record. Finally, he asserts that the court prejudicially concluded that he was responsible for ruining the lives of the doctors involved in the cases when they were culpable for their own conduct.

This Court reviews the reasonableness of a sentence under a deferential abuse of discretion standard. Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). This Court may "set aside a sentence only if [it] determine[s], after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable." United States v. Irey, 612 F.3d 1160, 1191 (11th Cir. 2010) (en banc).

The district court must impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. 18 U.S.C. § 3553(a)(2). In imposing a particular sentence, the court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range, the pertinent policy

---

[13]    Artigues was the former employee whom Caroni sued when he alleged that Artigues stole the Pensacola clinic from him.

34

statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims.  18 U.S.C. §3553(a)(1), (3) (7).

In reviewing the reasonableness of a sentence, this Court first ensures that the sentence was procedurally reasonable, meaning the district court properly calculated the guideline range, treated the Guidelines as advisory and not mandatory, considered the § 3553(a) factors, did not select a sentence based on clearly erroneous facts, and adequately explained the chosen sentence.  Gall, 552 U.S. at 51, 128 S. Ct. at 597.  The Guidelines dictate that where a sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on the other count shall run consecutively to the extent necessary to produce a combined sentence equal to the total punishment.  U.S.S.G. § 5G1.2(d).  Once the Court determines that a sentence is procedurally sound, it examines whether the sentence was substantively reasonable in light of the totality of the circumstances.  Id.

"The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors."  United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).  Although this Court does not apply a presumption of reasonableness for sentences falling within the guidelines range, "ordinarily [this Court] would expect a sentence within the Guidelines range to be

35

reasonable." United States v. Talley, 431 F.3d 784, 787-88 (11th Cir. 2005). This Court reverses only if "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Irey, 612 F.3d at 1190. "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Gall, 552 U.S. at 51, 128 S. Ct. at 597.

Congress has explicitly provided that there is no limitation on the information concerning "the background, character, and conduct" of the defendant that a court may consider in determining the appropriate sentences. 18 U.S.C. § 3661. At sentencing, a court's factual findings may be based on trial evidence, undisputed statements in the PSI, or evidence presented at the sentencing hearing. United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989).

First, the district court did not err in considering evidence regarding Artigues or the patient deaths. The Caroni deposition testimony recounted how two Global Pain employees were hired to work at Artigues's clinic, and the clinic's earnings went to Caroni, who would then pay Artigues. It was also permissible for the court to consider the evidence of the patient deaths because that evidence was introduced at sentencing. Wilson, 884 F.2d at 1356. Regardless, any error with respect to the

36

consideration of the death evidence was harmless because the court stated that it did not affect Caroni's sentences.

As to his argument regarding the consideration of Schedule II drugs in calculating his drug quantity, such consideration is expressly contemplated by the Guidelines. See U.S.S.G. § 2D1.1, comment. (n.12). Likewise, the court's partial attribution of the consequences the doctors faced to Caroni is consistent with the determination that he held a leadership role in the offense, and the court stated that it was not absolving the doctors of their own conduct. While Caroni is correct in pointing out that his sentences are significantly higher than those of DiLeo and Pastorek, their sentences are the result of "extraordinary" situations that warranted significant departures. DiLeo initially had a sentencing range of 188 to 235 months, the same range Caroni would have had without the leadership role adjustment. He received a 12-level departure because of the medical condition and special needs of his child, which resulted in a guideline range of 51 to 63 months. From there, the court imposed concurrent sentences of 24 months for both counts, representing a 27-month variance from the low end of his guideline range. Pastorek started with a much lower initial sentencing range because he was only charged and convicted for Count 1, and his guideline range was limited by his statutory maximum penalty. He received a 6-level departure for the medical

37

condition and medical needs of his child, and he was sentenced to 12 months and 1 day of imprisonment, which was within his guideline range.

By contrast, Caroni's otherwise applicable guideline range was 292 to 365 months. Under § 5G1.2(d), the court should have imposed his statutory maximum sentences consecutively to approximate his recommended guideline range, which would have resulted in a sentence of 276 months. Thus, his total sentence of 240 months represented a downward variance of 36 months, which is actually greater than the variance that DiLeo received. Accordingly, the disparities in the sentences are explained by the differences in circumstances between the three defendants.

Finally, Caroni's sentences are reasonable in light of the record as a whole. The district court thoroughly considered the § 3553(a) factors, the trial evidence, and the arguments of the parties. The court emphasized that it believed strong sentences were warranted based on the seriousness of the offenses and Caroni's role in perpetuating them. The nature and scope of Caroni's conduct resulted in the distribution of the equivalency of 16,517.99 kilograms of marijuana and resulted in the laundering of approximately $8,557,205 in funds. Further, his 240-month sentences represented a downward variance from his applicable guideline range, as discussed above. Given the seriousness and magnitude of the offenses, Caroni's leadership role in the offenses, and the district court's consideration of the §

3553(a) factors, Caroni's sentences are substantively reasonable. Accordingly, this Court affirms Caroni's sentences.

AFFIRMED.

MARTIN, Circuit Judge, dissenting:

It is well-settled that the government bears the burden of proving venue in every criminal case. United States v. Snipes, 611 F.3d 855, 865 (11th Cir. 2010). Here, Dennis Caroni, Gerard DiLeo, and Joseph Pastorek were indicted and tried in the Northern District of Florida even though they never traveled to that district. Consistent with our long-standing precedent, the government alleged that venue was proper because the defendants briefly extended their drug and money laundering conspiracies to the Northern District of Florida by hiring co-conspirators to open Global Pensacola, a pain management clinic in Pensacola, Florida. See United States v. Schlei, 122 F.3d 944, 975 (11th Cir. 1997) (a conspiracy may be prosecuted in any district in which an "overt act was committed in furtherance of its objects").

The precise issue that Messrs. Caroni, DiLeo, and Pastorek raise is not that this is a legally insufficient allegation, or even that the government failed to offer evidence in support of it. Instead, they argue that because venue is a question of fact, they were entitled to have the jury make a specific finding that either they or one of their co-conspirators committed an overt act in the Northern District of Florida. I agree with Messrs. Caroni, DiLeo, and Pastorek, as well as the majority, that the District Court erred by refusing to provide a jury instruction on venue and

prohibiting defense counsel from arguing that the government had failed to prove venue.

I part ways with the majority with respect to its holding that the District Court's error was harmless. I write separately to explain why the District Court's failure to instruct on venue and restriction of defense counsel's closing arguments constitute reversible error.

## I.

A defendant in a criminal case has the right to be tried in the district in which the crime was committed. For conspiracy offenses that span more than one district, venue is proper in any district in which the conspiracy was formed or in which a co-conspirator committed an act in furtherance of the conspiracy. Schlei, 122 F.3d at 975.

Questions of venue are not merely "pedantic, justice-defeating technicalit[ies]," but issues of constitutional magnitude. Green v. United States, 309 F.2d 852, 856 (5th Cir. 1962).[1] As the Supreme Court explained in United States v. Johnson, 323 U.S. 273, 65 S. Ct. 249 (1944), venue "touch[es] closely the fair administration of criminal justice and public confidence in it" by protecting defendants from prosecution in unfavorable or remote locations. Id. at 276, 278,

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1207.

41

65 S. Ct. at 250, 252.  Indeed, the importance of this right is evident from the fact that it is guaranteed by two separate constitutional provisions and a federal statute. See U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ."); id. amend. VI (requiring trial "by an impartial jury of the State and district wherein the crime shall have been committed"); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").

Because it is grounded in our constitution, we have characterized venue as an "essential element of the government's proof at trial," Snipes, 611 F.3d at 865, and continuously reaffirmed that the government bears the burden of proving venue in every criminal prosecution, see, e.g., United States v. Stickle, 454 F.3d 1265, 1272 (11th Cir. 2006); United States v. Breitweiser, 357 F.3d 1249, 1253 (11th Cir. 2004); United States v. White, 611 F.2d 531, 534 (5th Cir. 1980).  And we have also explained that it is especially important for courts to safeguard a defendant's venue right in conspiracy prosecutions because a jury need not find that the government proved every act alleged in the indictment in order to convict. Thus, "[t]he dangers of abuse are manifold if the Government can obtain an indictment for conspiracy in a district other than the district where the offense was

actually committed merely by alleging that one act, which need never be proved, was committed in that district." Green, 309 F.2d at 856.

However, although venue is a question of fact—did the crime take place in the district of prosecution?—our precedent makes clear that a district court is not always required to present this question to the jury. Compare Bellard v. United States, 356 F.2d 437, 439 (5th Cir. 1966), with Snipes, 611 F.3d at 866; see also United States v. Perez, 280 F.3d 318, 330 (3d Cir. 2002) (stating that "venue does not automatically present a question for the jury"). This Court last addressed the specific question raised by the appellants—in what circumstances a district court errs by failing to instruct the jury on venue—in White, 611 F.2d 531. In that case, Charles White was convicted in the Middle District of Florida for a number of offenses arising from the theft and forgery of a Social Security check. Id. at 533–34. Mr. White argued that the district court erred by failing to give a jury instruction on venue because the government had offered no direct evidence that his crimes had been committed in the Middle District. Id. at 535–36.

We held that the district court's failure to provide a venue instruction did not constitute plain error[2] for the following reasons:

> First, Count Two of the indictment charged that White forged the check in the Middle District of Florida. The indictment appears to

---

[2] Unlike the appellants in this case, Mr. White did not request a jury instruction on venue. White, 611 F.2d at 536.

have been read to the jury only once, before the jury was sworn, but the trial judge sent a copy of the indictment into the jury room for consideration by the jury during its deliberations. Second, in instructing the jury on the essential elements of forgery, the trial court stated that the government must prove beyond a reasonable doubt "the act of forging the payee's endorsement on the United States Treasury check as charged." Third, White's counsel argued the territorial jurisdiction and venue question in his closing argument. Finally, there was sufficient evidence for a jury to conclude that the forgery occurred in the Middle District of Florida.

Id. at 537.

White's reasoning is instructive: no separate venue instruction was required because the jury's guilty verdict necessarily included a finding of proper venue. In other words, because the indictment alleged offense conduct only in the Middle District of Florida, the jury could not have found the defendant guilty unless it specifically found that the defendant committed an act within that jurisdiction. See id. Several other circuits have articulated similar rules. See, e.g., United States v. Miller, 111 F.3d 747, 751 (10th Cir. 1997) ("We therefore adopt the rule that failure to instruct on venue, when requested, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue."); United States v. Martinez, 901 F.2d 374, 376 (4th Cir. 1990) ("Venue is an issue in this case because the jury was able to convict the defendant of the offenses charged without an implicit finding that the acts used to establish venue had been proven."); United States v. Moeckly, 769

44

F.2d 453, 461 (8th Cir. 1985) ("The issue here is whether venue was proven where there was no finding by the jury that at least one overt act or the conspiratorial agreement occurred in Minnesota . . . . Some finding by the jury on this issue should have been required.").

Applying this standard, the District Court erred. The indictment in this case alleged a conspiracy in both the Northern District of Florida and the Eastern District of Louisiana, and the jury's guilty verdict did not necessarily incorporate a finding that the defendants committed any act—criminal or otherwise—in the Northern District of Florida. Thus, the District Court should have provided a jury instruction on venue and permitted defense counsel to argue that the government had failed to prove venue. The majority does not dispute this conclusion.

The majority and I part ways, however, in our application of the harmless error standard. Under Chapman v. California, 386 U.S. 18, 87 S. Ct. 824 (1967), Messrs. Caroni, DiLeo, and Pastorek are entitled to reversal unless the government "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[3] Id. at 24, 87 S. Ct. at 828. Under these

---

[3] To the extent that the majority applies some other harmless error standard, it has no basis in our precedent. And although several of our sister circuits have held that a failure to instruct the jury on venue is harmless error if evidence of venue is "substantial and uncontroverted," uncontroverted in this context takes its literal meaning: not contested at trial. See Martinez, 901 F.2d at 377 (holding that evidence of venue was "substantial and uncontroverted" where it had not been contested at trial); see also United States v. Neder, 197 F.3d 1122, 1129 n.6 (11th Cir. 1999) (stating that the fact that an omitted element "was not contested supports the conclusion

circumstances, where the jury has made no finding on a required element of an offense, our inquiry focuses on "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." Neder v. United States, 527 U.S. 1, 19, 119 S. Ct. 1827, 1839 (1999).  Said differently, the government bears the burden of proving, beyond a reasonable doubt, that a rational jury could not have concluded that venue was improper.  I believe the government has failed to carry this burden.

The majority makes much of the "substantial and uncontroverted" evidence regarding Global Pensacola.  However, while it was not disputed that Mr. Caroni founded Global Pensacola, the relevant question here is whether its establishment was an overt act in furtherance of the conspiracy between Messrs. Caroni, DiLeo, and Pastorek such that it could establish venue in the Northern District of Florida.  The evidence on this question was more limited.  Global Pensacola operated for only two weeks during what was otherwise a four-year conspiracy, and Mr. Caroni was the only one of the three defendants who had a role in founding the clinic.  Indeed, the government presented no evidence whatsoever linking Mr. Pastorek to

---

that the jury's verdict would have been the same absent the error." (emphasis added)).  The defendants here contested whether their conspiracy extended to the Northern District of Florida.

Global Pensacola.[4]  Finally, as a result of the short amount of time that Global

Pensacola operated, the government's evidence about this clinic's operations was

necessarily quite limited.  For instance, although a critical question in this case was

whether patients received prescriptions that were made "outside the usual course of

medical practice and for other than legitimate medical purposes," the jury only

heard from one Global Pensacola patient who had visited the clinic a single time

and had not been treated by any of the defendants.

For the reasons described in the majority opinion, it is certainly conceivable

that the jury—if it had been presented with the question—would have found that

venue was proper in the Northern District of Florida.  But that is not our inquiry.

Because this question was taken away from the jury in violation of the defendants'

constitutional rights, our task on harmless error review is to determine whether

there exists "evidence that could rationally lead to a contrary finding."  Neder, 527

U.S. at 19, 119 S. Ct. at 1839.  Under these facts, my answer is yes.  I respectfully

dissent.

---

[4] I recognize that a co-conspirator may be held responsible for aspects of a conspiracy in which he had no direct involvement.  However, the government's inability to connect Mr. Pastorek to Global Pensacola is undoubtedly relevant to the question we face here—whether the establishment of Global Pensacola was an overt act in furtherance of a conspiracy involving Mr. Pastorek.  See United States v. Chandler, 388 F.3d 796, 811–12 (11th Cir. 2004).  As this Court explained in Green, "[t]here is grave danger of injustice where, as in the present case, one defendant was not even alleged to have participated in the one act which occurred in the district where the indictment against him . . . was returned."  309 F.2d at 856.